UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. PERCY ANDERSON, JUDGE PRESIDING

ENERGY INTELLIGENCE GROUP, INC., )
et al.,                          )
                                 )
                    Plaintiffs,  )
                                 )
          vs.                    ) No. CV 11-10556 PA
                                 )
PLAINS ALL-AMERICAN PIPELINE LP, )
et al.,                          )
                                 )
                    Defendants.  )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Friday, December 21, 2012; 1:34 P.M.

Pretrial Conference

Wil S. Wilcox, CSR 9178
Official U.S. District Court Reporter
312 North Spring Street, # 432-A
Los Angeles, California 90012
Phone: (213) 290-2849

```
 1    APPEARANCES OF COUNSEL:

 2
      FOR THE PLAINTIFFS:
 3
                           POWLEY GIBSON
 4                         BY: ROBERT L. POWLEY, ESQ.
                           304 HUDSON STREET
 5                         2ND FLOOR
                           NEW YORK, NY 10013
 6                         (212) 226-5054
                           rlpowley@powleygibson.com
 7

 8    FOR THE DEFENDANT:

 9                         MESEREAU AND YU LLP
                           BY: THOMAS A. MESEREAU, JR., ESQ.
10                         And SUSAN YU, ESQ.
                           10390 SANTA MONICA BOULEVARD
11                         SUITE 220
                           LOS ANGELES, CA 90025
12                         (310) 789-1177
                           yu@mesereauyu.com
13                         mesereau@mesereauyu.com

14

15                         POWLEY GIBSON
                           BY: STEPHEN M. ANKROM, ESQ.
16                         304 HUDSON STREET
                           2nd FLOOR
17                         NEW YORK, NY 10013
                           (212) 226-5054
18                         smankrom@powleygibson.com

19

20

21

22

23

24

25
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

| | |
|---|---|
| 1 | LOS ANGELES, CA.; FRIDAY, DECEMBER 21, 2012; 1:34 P.M. |
| 2 | -oOo- |
| 3 | THE CLERK:  Calling No. CV 11-10556 PA, |
| 4 | Energy Intelligence Group, Inc. vs. Plains All American |
| 5 | Pipeline, LP. |
| 6 | Counsel, please state your appearances. |
| 7 | MS. YU:  Good afternoon, Your Honor.  Susan Yu |
| 8 | appearing on behalf of defendants and counter-claimants |
| 9 | Plains All American Pipeline, LP and Plains Marketing, LP. |
| 10 | MR. MESEREAU:  Good afternoon, Your Honor. |
| 11 | Thomas Mesereau also appearing on behalf of defendant and |
| 12 | counter-claimants Plains All American Pipeline, LP, and |
| 13 | Plains Marketing, LP. |
| 14 | MR. POWLEY:  Good afternoon, Your Honor. |
| 15 | Robert Powley appearing on behalf of |
| 16 | plaintiffs/counter-defendants Energy Intelligence Group, |
| 17 | Inc. and Energy Intelligence Group UK, Limited.  Thank you. |
| 18 | MR. ANKROM:  Good afternoon, Your Honor. |
| 19 | Steven Ankrom also appearing on behalf of plaintiffs and |
| 20 | counter-defendants Energy Intelligence Group, Inc. and |
| 21 | Energy Intelligence Group UK, Limited. |
| 22 | THE COURT:  Good afternoon.  All right.  Let's see |
| 23 | where we can begin. |
| 24 | What's the status of the jury instructions in this |
| 25 | case? |

1        MR. POWLEY:  Your Honor, the parties have met and

2   conferred on the jury instructions, and at this point there

3   are no disputed jury instructions between the two parties.

4        MS. YU:  That is correct, Your Honor.

5        THE COURT:  All right.  Well, I guess we are

6   making some progress.

7        How many exhibits are you offering at trial?

8        MR. POWLEY:  Your Honor, right now we have 321,

9   but 144 are copyright registrations.  Other than the

10   copyright registrations, we have 177 exhibits.

11        THE COURT:  Okay.  Do you have any objection to

12   the copyright registrations?

13        MS. YU:  Yes, we do, prior to June 6, 2009 -- I'm

14   sorry, July 6, 2009, because they are barred by the statute.

15        MR. POWLEY:  Your Honor, they are certified copies

16   of the registrations as they exist.  They are being offered

17   for prima facie evidence of the existence of the

18   registration.  Whether or not claims based on those are

19   barred by statute of limitations is really a subsequent

20   issue.

21        THE COURT:  Yeah.  Isn't that right?

22        Other than the fact that you may have a claim that

23   the statute's run on some of their claims, do you have any

24   other objections, any other evidentiary objections to those

25   registrations?

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              MS. YU:  Other than the statute of limitations,
 2     no, Your Honor.
 3              THE COURT:  Okay.  All right.  So that eliminates
 4     how many exhibits?
 5              MR. POWLEY:  That removes 144 exhibits.
 6              THE COURT:  Okay.  There are a number of e-mails
 7     here to which you've lodged objections.
 8              Who are these e-mails to?
 9              MS. YU:  From our e-mails, Your Honor, or on their
10     exhibit list?
11              THE COURT:  On their exhibit list.  Okay.
12              Why don't we start this way.  You have a number of
13     e-mails here.  We will just start off with No. 3, Exhibit 3.
14              MR. POWLEY:  Yes, Your Honor.
15              THE COURT:  Okay.  What are you offering?  Who is
16     the e-mail to and who is it from?
17              MR. POWLEY:  The e-mail is from Sonya Jones to
18     Araceli Gudino, both employees of the defendant.
19              THE COURT:  What are you offering it to show?
20              MR. POWLEY:  To show the procedures at place
21     within defendant's organization to forward our publication.
22              THE COURT:  What's the e-mail say; do you know?
23              MR. POWLEY:  I believe it's at a time when
24     Sonya Jones was handling the forwarding and was
25     transitioning it to --
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1            THE COURT:  So this is an e-mail where she's
 2   forwarding a copy of your client's --
 3            MR. POWLEY:  She's describing to Araceli how to do
 4   the forwarding for the latter period.
 5            THE COURT:  Okay.  What's the objection to that?
 6            MS. YU:  Obviously, Your Honor -- I apologize.  I
 7   think that we are going to further meet and confer on the
 8   exhibit stipulation.  And that's probably not going to --
 9            THE COURT:  Then why don't you sit down and go
10   through the remaining exhibits to which there have been
11   objections lodged and see if you can work through any of
12   those objections.
13            MR. POWLEY:  Your Honor, we only have two
14   objections to their exhibits.  Should we work through that
15   together at the same time?
16            THE COURT:  That would be good.
17            MR. POWLEY:  Okay.  You got it.
18            THE COURT:  You guys can sit down if you like.
19            MS. YU:  Yes, Your Honor.
20            THE COURT:  You have an affirmative defense where
21   you are seeking declaratory relief that the subscription
22   agreement is invalid and permitted your clients to make
23   copies.  Is that --
24            MS. YU:  We have a counterclaim for declaratory
25   relief --
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              THE COURT:  Okay.
 2              MS. YU:  -- asking whoever the trier of fact will
 3     be that the subscription agreement was a company
 4     subscription for all employees.
 5              THE COURT:  Okay.  And is that based on just the
 6     agreement itself?
 7              MS. YU:  They're a series of agreements, that's
 8     correct, Your Honor, and also witnesses employees'
 9     understanding in the course of conduct.
10              THE COURT:  Let me ask you this.
11              MS. YU:  Yes, Your Honor.
12              THE COURT:  Are you saying that on the face of
13     this subscription agreement that it permitted your client to
14     make copies of these newsletters or whatever they are?
15              MS. YU:  On the face of -- yes, that is correct,
16     because there are a series of -- it was a double-sided
17     invoice.
18              THE COURT:  Uh-huh.
19              MS. YU:  And only the first page was provided to
20     the administrative assistant and nobody looked at the back.
21              THE COURT:  Well, that's different.  When you say
22     nobody looked at the back, are you saying that it wasn't
23     there or that they'd simply failed to look at it?
24              MS. YU:  Actually, both.  From 1999 -- I'm sorry,
25     1996 all the way until 2004, there were no restrictions
```

1    whatsoever.  They never said anything about how many people

2    can look at it.

3           THE COURT:  Was that a paper copy that you were

4    receiving during that time period?

5           MS. YU:  The paper copy was up until the year 2000

6    from 1996.  So from the year 2000 all the way until 2004,

7    there were no restrictions on the back whatsoever.  Then

8    from 2004 all the way to 2007, still no restrictions.  It

9    doesn't say how many people can look at it or forward it,

10   nothing like that.

11          Then from 2007 all the way until 2011, they insert

12   it on the back of the invoice in fine print saying this is

13   limited to individuals or employees.

14          THE COURT:  Okay.  When did that happen?

15          MS. YU:  In 2007.

16          THE COURT:  Were they still sending it

17   electronically or by paper?

18          MS. YU:  That was electronically, Your Honor.

19          THE COURT:  Okay.

20          MS. YU:  That leaves room for legal

21   interpretation.

22          THE COURT:  Excuse me.  So my question is:  In

23   2007 when they gave you the new subscription agreement, you

24   received both the front and the back?

25          MS. YU:  Yes.  It was double-sided, but we never

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1    got the back side and it was just a simple --
 2            THE COURT:  Let's try this again.
 3            MS. YU:  Yes, Your Honor.
 4            THE COURT:  In 2007 when they sent you the
 5    subscription agreement, did you receive the complete
 6    document?
 7            MS. YU:  Yes.
 8            THE COURT:  Okay.  And I take it it's your
 9    position that for whatever reason nobody looked at the
10    back --
11            MS. YU:  That's correct.
12            THE COURT:  -- they assumed it was the same
13    subscription agreement they'd been receiving for years?
14            MS. YU:  Yes, that's correct.
15            THE COURT:  Okay.  Now, so your position that the
16    subscription agreement permitted your clients to copy it is
17    based on something more than merely the subscription
18    agreement itself?
19            MS. YU:  That is correct.
20            THE COURT:  Okay.  I'm going to send out an order
21    today.  In fact, you can probably pick it up from the clerk
22    before you leave today.  And I want -- each side, I take it,
23    has asserted certain affirmative defenses, and I'd like a
24    written proffer as to each of those affirmative defenses.
25            In other words, I want to know what witnesses you
```

1    are going to call in support of these affirmative defenses

2    and what those witnesses are going to say.  Be very specific

3    and be complete.  And, also, any documents they are going to

4    rely on in support of those affirmative defenses.

5              And neither side is calling any expert witnesses?

6              MS. YU:  That is correct, Your Honor.

7              MR. POWLEY:  That's correct, Your Honor.

8              THE COURT:  And as I understand it, the plaintiffs

9    are not offering any deposition testimony?

10             MR. POWLEY:  We are going to be offering testimony

11   of one witness.  His deposition is being taken next week and

12   he is a third party that lives in Houston and won't be

13   appearing at the trial.

14             THE COURT:  And what does he have to say that's

15   relevant to this dispute?

16             MR. POWLEY:  Well, that's still to be determined,

17   but he was involved in a certain period of time when the

18   forwarding was going on and he was promoting it within the

19   company to other individuals.  He's since left the company.

20   We have e-mails that we received from the defendant

21   describing that behavior and so we want to speak to him

22   about that at the time.

23             THE COURT:  Well, let me ask you a question here:

24   Is there really any dispute whether or not these e-mails

25   were forwarded around to the company?

```
 1          MR. POWLEY:  Your Honor, we don't think there is a
 2     dispute regarding that.
 3          MS. YU:  There are as to a certain number of
 4     employees.  We don't know because the number of employees
 5     who got them change over time and a lot of the employees --
 6          THE COURT:  But there really is no dispute as to
 7     that it was copied and sent around.
 8          MS. YU:  As to the first person who sent them,
 9     that's correct.  But we don't know whether the subsequent
10     people who received the e-mails then forwarded it to others,
11     and I think that employee, ex-employee, I think they are
12     seeking to see whether that person did that.
13          THE COURT:  Okay.  When's his deposition being
14     taken?
15          MR. POWLEY:  On the 28th, Your Honor.
16          THE COURT:  Okay.  Are you offering any other
17     testimony by way of deposition?
18          MR. POWLEY:  No, Your Honor.  We are not and we
19     may not offer any of his depending on the deposition, but we
20     are not offering any other.
21          THE COURT:  Okay.  Are you going to be offering
22     any testimony by deposition?
23          MS. YU:  Just one.
24          THE COURT:  Who is that?
25          MS. YU:  George King, that's plaintiff's chief
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1    financial officer.

2              THE COURT:  Okay.  And have you designated that

3    testimony?

4              MS. YU:  Yes, we did.

5              THE COURT:  Okay.  Do you have any objections to

6    any of those designations?

7              MR. POWLEY:  In part of it, we do.  It forms the

8    basis of our motion in limine.

9              THE COURT:  Putting aside the motion in limine, do

10   you have any objections to any of that deposition testimony?

11             MR. POWLEY:  Other than some of the subject of

12   that motion, no, Your Honor, we don't.

13             THE COURT:  And the motion is?

14             MR. POWLEY:  Well, the motion is regarding

15   previous --

16             THE COURT:  Other lawsuits?

17             MR. POWLEY:  -- other lawsuits.

18             THE COURT:  Okay.  So other than the fact of the

19   other lawsuits, you don't have any objections to the

20   testimony they are seeking to proffer?

21             MR. POWLEY:  No, we don't, Your Honor.

22             THE COURT:  Okay.  Now, as to these other

23   lawsuits --

24             MR. POWLEY:  Uh-huh.

25             THE COURT:  -- what's that being offered for?

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1          MS. YU:  The other lawsuits are relevant because

2    Mr. King testified that he oversees all the lawsuits, the

3    profitability of the company and also --

4          THE COURT:  Why is that relevant?

5          MS. YU:  Because it goes directly to their

6    knowledge of other so-called copyright infringements for

7    purposes of statute of limitations.  That's one.  And number

8    two, they had other witnesses who were getting a bonus of

9    $5,000 each for helping the company target customers and sue

10   them.

11         We also obtained testimony of the company's,

12   plaintiff's 30(b)(6) witness that virtually all of their

13   revenues for the company is generated by lawsuits.  So it

14   goes directly to the relevance of their scheme.  It also

15   goes to the issue of statute of limitations because

16   plaintiffs had ample opportunity to pursue all of these

17   claims from inception.

18         There is several -- a number of instances where

19   they had the opportunity.  And when they started suing

20   people, suing companies as early as 2005, why are they suing

21   all these companies?

22         THE COURT:  I don't care, and I'm not sure the

23   jury really cares.

24         MS. YU:  It's relevant to the statute of

25   limitations because the only reason why they were suing,

1    they said, there testimony was that it was to protect the

2    copyright.

3          They only had 200 customers at the time who

4    subscribed to the *Oil Daily*, and from 1999 all the way

5    through June 6, 2007, they never put any copyright notice on

6    their papers, even though they registered, there was no

7    notice.  But they started suing all these companies.

8          The fact that they were only sending one invoice

9    every year saying please renew today, please renew today,

10   without ever telling us that they are concerned about

11   copyright.  They are never telling us that we are going

12   to --

13         THE COURT:  Doesn't a notice -- when they wanted

14   you to renew as of 2007, didn't the notice change and didn't

15   the notice say that, hey, it's a one subscriber operation?

16         MS. YU:  No.  They never said that.

17         THE COURT:  When does the notice change?

18         MS. YU:  The notice changed right before they sued

19   us, right before sometime in October of 2011, they changed

20   further on the back of the invoice.  They eliminated the two

21   key words, this subscription is for individuals and

22   employees.  They deleted that and inserted:  This

23   subscription is only for one person, after they set up

24   Araceli, administrative assistant, to say that this -- the

25   person at plaintiff's company had her, lured her into

1   sending her this list.  I will get back to you about your

2   subscription and then they go and change, further change on

3   the back of the invoice.

4           So, the evolution of the subscription invoices,

5   Your Honor, in the beginning no restriction whatsoever.  It

6   doesn't say anything about how many people can read it.

7   Then they changed --

8           THE COURT:  At that point it's a hard copy, right?

9           MS. YU:  No, no, no.  A hard copy was 1999.  They

10  are saying electronic began -- they are saying electronic

11  began in 1999.  We thought it was 2000, 2001.  They said as

12  early as 1999.

13          THE COURT:  Okay.  When did you start getting

14  electronic copies?

15          MS. YU:  We believe, based on witnesses' memory,

16  they thought it was early 2000, 2001, 2002.

17          THE COURT:  Okay.

18          MS. YU:  So from -- the paper lasted between 1996

19  and up until about 2000, we thought.  The electronic

20  began -- they switched from paper to electronic on their

21  own.  We had no choice.  We had no other way of getting it.

22  And they say it's perfectly fine to get a hard copy, the

23  hard copy needs to go to you in the mail.  You can route it

24  to as many employees as possible.

25          But they are saying that once we switched over to

1    electronic, you can't do that.  They never told us we

2    couldn't do that.  So if they are saying it's okay for the

3    employees to circulate by paper, what else are they going to

4    think we are going to do when we get it by electronic?

5              THE COURT:  Again, I think we started off --

6              MS. YU:  Yes.

7              THE COURT:  -- as to why this is relevant to --

8              MS. YU:  Yes.  So other lawsuits in terms of their

9    knowledge about copyright infringement.  So when they

10   switched over from paper to electronic, they certainly had

11   knowledge that we are going to be forwarding electronically.

12   They knew that.  Other lawsuits come into play because they

13   started suing other companies in 2005 for precisely for the

14   same reason.

15             THE COURT:  In 2005?

16             MS. YU:  Yes.  That's when they started suing

17   every year.  So if they think that, okay, people out there

18   have a misunderstanding about their subscription, I as a

19   copyright owner, the first thing I would do is when I send

20   out a letter or an invoice saying before you renew today I

21   want you to understand there is confusion out there about

22   whether this is a company subscription or a one-person

23   subscription.  They never said that.  Yet, they are suing

24   everybody and the same issue arose as to whether it was for

25   one person or for the entire company.  So they had an

```
 1   opportunity to let everybody and sued us.

 2          THE COURT:  Okay.  So the evidence that you want

 3   to put in is what?

 4          MS. YU:  The evidence of other lawsuits are

 5   relevant that the fact that they knew about these copyright

 6   infringements or alleged copyright infringements and they

 7   had an opportunity to sue us back in 2005 and every year

 8   this was happening.

 9          THE COURT:  And why is that important for the

10   jury?

11          MS. YU:  Because they will know that that's when

12   they had the opportunity because under Polar Bear and Jay-Z,

13   the Ninth Circuit decision, for purpose of statute of

14   limitations there is actual and constructive.  And in Jay-Z,

15   Judge Snyder applied Polar Bear, a Ninth Circuit decision in

16   December 2011.  She said, look, okay, Ninth Circuit under

17   Polar Bear we adopt the fact that it's actual and

18   constructive notice.  But you can't just sit around if you

19   have reasonable opportunity to --

20          THE COURT:  Excuse me.  Okay.  So where do you

21   think the statute --

22          MS. YU:  -- of limitations for purposes of prior

23   to July since they filed their lawsuit on July 6th, 2012.

24   First, December 21, 2011; then second, the second lawsuit

25   was July 6, 2012.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              THE COURT:  Okay.
 2              MS. YU:  So if we apply three years going back
 3    because they are separate paper they are saying, so the
 4    earliest time would be three years from July 6, 2009.  So
 5    prior to July 6, 2009, they are barred because they knew all
 6    these things were going on and they didn't let anybody know,
 7    and instead they are tampering with the invoice on the back.
 8    Why aren't they telling us --
 9              THE COURT:  Tampering?
10              MS. YU:  I'm sorry.  They are changing the terms.
11    So in early 2004 from 1996 all the way to 2004 --
12              THE COURT:  Okay.  So -- I don't mean to cut you
13    off but -- well, actually, I do.
14              MS. YU:  No problem, Your Honor.
15              THE COURT:  So what you are really saying is you
16    think that they shouldn't be able to get any claims from,
17    say -- well, the only claims that are valid are those from
18    2009 going forward?
19              MS. YU:  That's correct.  As to this particular
20    case because 2000 -- July 6, 2009, they had three years to
21    sue and they did.  So they are cut off.  Prior to that they
22    can't sue because they had all the opportunity, plenty of
23    ample opportunity to explore this copyright.
24              THE COURT:  What evidence do you have that they
25    knew that your client was circulating those prior to that
```

1    time period?

2              MS. YU:  Their own witnesses.

3              THE COURT:  Okay.

4              MR. POWLEY:  Yes.  Your Honor, there is no

5    evidence, factual or testimonial, as of this point that we

6    had any knowledge regarding what they were doing on their

7    secure e-mail system prior to when we learned in October of

8    2011.  There is no knowledge.  Every one of our publications

9    have always carried copyright notice internal near the end

10   or near the top.  There might have been a handful that might

11   have mistakenly omitted it.  Every --

12             THE COURT:  From when?  Starting when?

13             MR. POWLEY:  They've been a publisher for six

14   decades so I think all of them had copyright notices.

15             THE COURT:  And you are seeking to go back how

16   far?

17             MR. POWLEY:  We first learned and had an

18   opportunity to learn of their infringement -- so we are

19   seeking to go back to when they started forwarding the

20   publication which we believe was in December of 1999.

21             THE COURT:  Okay.  What's the evidence that they

22   knew that your client was forwarding these e-mails?

23             MS. YU:  Their 30(b)(6) witness testified

24   yesterday that they were protecting their copyright

25   infringements on the *Oil Daily* paper as early as 2005 for

1  all of the customers.

2       THE COURT:  But that doesn't say -- I will take a

3  look at the testimony, but that doesn't say that they knew

4  your client was forwarding these e-mails.

5       MS. YU:  But the very fact, Your Honor, that --

6       THE COURT:  So they have to assume that you are

7  violating their copyright and sue you?

8       MS. YU:  No.  They had an affirmative duty under

9  *Jay-Z* and *Polar Bear*.  They had an affirmative duty.  If

10  there is some kind of constructive notice --

11       THE COURT:  Constructive notice of what?

12       MS. YU:  Of notice of copyright infringement by --

13       THE COURT:  By your client?

14       MS. YU:  By their customers, which we are

15  included, and so they could have --

16       THE COURT:  Are you saying that that case says if

17  you have knowledge that your software, paper, book is being

18  copied by somebody in New York, that that means that you

19  have to sue customers in California?

20       MS. YU:  No, Your Honor.  That case says you have

21  a reasonable inquiry to look into it and see if that is

22  actually happening such that you can't just --

23       THE COURT:  A reasonable inquiry.  Okay.  So you

24  are put on reasonable inquiry notice as to everybody?

25  Microsoft is going to have to sue everybody, all of their

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1    customers?

2         MS. YU:  Not suing.

3         THE COURT:  Because one guy says that you are

4    copying their software?

5         MS. YU:  No.  Because they were filing lawsuits

6    precisely for the same reason, Your Honor, and they didn't

7    have that many *Oil Daily* papers.

8         THE COURT:  But I think you have to -- don't you

9    have to link it to them?  Don't they have to link it to

10   their client --

11        MS. YU:  Yes.

12        THE COURT:  -- if they had some reasonable basis

13   for believing that your client was copying this newsletter?

14        MS. YU:  Right.  We can put all of the evidence

15   and pieces together because timing is such that, Your Honor,

16   they start suing people.  The companies, Your Honor, we are

17   one of them, and they could have easily -- instead of suing,

18   they could have asked us before they renew the invoice.  Why

19   aren't they asking us if that wasn't our understanding?

20   Instead, they are saying, okay, there is no restriction on

21   your invoice.

22        THE COURT:  Are you saying that because Microsoft

23   puts on their software please do not copy this software and

24   they find out that at least one person is copying it, that

25   then they have to go ask all of their customers or remind

1    their customers you are not to copy this?

2              MS. YU:  No.  The facts are different in our case

3    because on the one hand up until 2007 on the back of the

4    invoice.  Why they are suing people, suing customers?  On

5    the back we had no restrictions.  The issue is, is this

6    subscription for one person or for everybody?

7              THE COURT:  I understand that.

8              MS. YU:  Yes, Your Honor.

9              THE COURT:  You are trying to assert that somehow

10   the statute of limitations has run.

11             MS. YU:  Right.

12             THE COURT:  And you are trying to assert that they

13   were on reasonable inquiry notice?

14             MS. YU:  Yes.

15             THE COURT:  If what you are saying is that they

16   were on notice because other people were copying it, I don't

17   think that's going to work.  If they had some basis for

18   knowing that your client was making those copies, fine.  But

19   I don't think just because somebody's copying, that that

20   automatically puts them on notice that your client is doing

21   it.

22             MS. YU:  No.  But they are claiming that the very

23   fact that they had ten-year programs to actively go out and

24   protect their intellectual property rights, I got that

25   testimony yesterday from their 30(b)(6) witness.  And he

```
 1   said that for the last decade or so we have this program, we
 2   go out and actively see whether people are infringing and
 3   that's why they said they had this litigation program.
 4              THE COURT:  Okay.  Did he say, yeah, and we knew
 5   ten years ago that you people were doing it?
 6              MS. YU:  No.  Because they are not sure whether
 7   they ever even asked us whether we had a one-person
 8   subscription or for all, everybody else.
 9              THE COURT:  Okay.
10              MS. YU:  So on the one hand what they are doing is
11   they are filing lawsuits against companies, and yet, at the
12   same time, they didn't sue us back in 2005 because on our
13   subscription invoice there was no restriction.  It didn't
14   say it was only for one person.
15              They added that in 2007.  And then it says this
16   subscription is for all individuals or employees, so plural
17   in brackets.  So even if we had read it, which they never
18   asked us to read, but even if we had read it we can still
19   construe that as it applies to individuals and employees and
20   administrative assistants --
21              THE COURT:  Well, that may be your defense.
22              MS. YU:  Yes.  Then at the end right before they
23   sued us, they realized that was a problem so they changed
24   those terms to -- from individuals to only one person.
25              THE COURT:  All right.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1            MS. YU:  So the opportunity to inquire, the only
 2    thing they could have done and if they had said, look, you
 3    guys are -- it has come to our attention, we don't have many
 4    Oil Daily customers.
 5            If they are sending out this one letter
 6    broadcasting by just the one button just saying it has come
 7    to our attention that there is confusion out there.  People
 8    think that this is a company subscription.  If they had done
 9    that and we still did it, then that would be a problem for
10    us, but they never ever did that.
11            THE COURT:  Why aren't these other lawsuits or
12    other instances where you've had to sue people, why isn't
13    that relevant as to wilfulness?
14            MR. POWLEY:  To wilfulness?
15            THE COURT:  Yes.
16            MR. POWLEY:  I don't think the other lawsuits are
17    relevant to willfulness.
18            THE COURT:  I'm not sure about that.  You want to
19    say that what they were doing they did this intentionally,
20    right, that there was no confusion?  And aren't these other
21    indications that people who were sued, isn't that some
22    indication that there was some confusion out there?
23            MR. POWLEY:  No.  I don't agree with your
24    interpretation, Your Honor.  I don't think we can imply what
25    the other people thought to them.
```

```
 1              THE COURT:  I don't think it works for the statute
 2    of limitations, but it may very well go to willfulness
 3    because your clients were probably aware very early on that
 4    there were problems with people on these subscriptions and
 5    that people were being I guess sort of trapped into thinking
 6    that it was okay to make copies of this and that may be
 7    relevant as to willfulness.
 8              MR. POWLEY:  They weren't trapped, Your Honor.  In
 9    the other cases, too, unequivocally the other individuals
10    knew from the subscription agreements what they were doing
11    was improper.  They had e-mails to that nature.  But there
12    is none of that in this record right now.  And we didn't
13    trap anyone.
14              THE COURT:  Well, you may not have, I guess.  But
15    isn't it relevant that -- I take it that you've sued more
16    than just these clients?
17              MR. POWLEY:  We have.
18              THE COURT:  Okay.  And so isn't the jury entitled
19    to know that there were more than just these people who were
20    confused about whether or not they were entitled to make
21    copies of this and doesn't that go to willfulness at a
22    minimum?
23              MR. POWLEY:  Well, the thing is what does that
24    mean to the jury because each entity may not have been
25    confused, many of them we sued absolutely knew what they
```

 1   were doing was impermissible --

 2          THE COURT:  Uh-huh.

 3          MR. POWLEY:  -- based on these very same

 4   agreements.  There was no unique agreement sent to

 5   plaintiffs that wasn't sent to every one of our clients

 6   concurrently.

 7          There is no evidence.  We could bring one of our

 8   witnesses to talk about what the other witnesses -- the

 9   other defendants said in their apologies and their

10   admonition that they clearly knew what they were doing was

11   wrong, large scale companies from Exxon and others.

12          THE COURT:  I'm sorry.  What did you say?

13          MR. POWLEY:  Large scale companies such as Exxon

14   and others had knowledge.  When we brought to their

15   attention what was happening, they were apologetic.  We

16   resolved those matters.

17          It's hard to get evidence.  Our witnesses can't

18   talk --

19          THE COURT:  Did you go to them and say, hey, you

20   can't make copies of these?

21          MR. POWLEY:  Every day when we sent out the

22   publication, we'd tell them on the cover you can't make

23   copies and forward.  Every publication comes with that

24   warning.

25          THE COURT:  Do you have a copy here?

```
 1              MR. POWLEY:  Do you have a copy of that cover
 2    e-mail?
 3              THE COURT:  Well, when did you start sending this
 4    warning out?
 5              MR. POWLEY:  Well, every subscription agreement,
 6    Your Honor, always prohibited making copies.  It had, as the
 7    statute required, notice of the year, the entity who owns
 8    the copyright and the word copyright, which under the act is
 9    what you are required to put people on notice that it's
10    protected work.  We never informed them that they could make
11    copies.
12              THE COURT:  Do you have any evidence that in these
13    other lawsuits that they were suffering from the same
14    confusion that you were?
15              MS. YU:  No, no, because in those lawsuits they've
16    marked them all confidential.
17              THE COURT:  I'm sorry?
18              MS. YU:  The answer is no, Your Honor, because all
19    those lawsuits, they marked them all confidential.
20              THE COURT:  What do you mean they marked them
21    confidential?
22              MS. YU:  The plaintiffs and the parties --
23              THE COURT:  Yes.
24              MS. YU:  -- when they settled, they agreed that
25    everything in those cases were marked confidential.  So we
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1    could not get any evidence of that.  But I learned

2    through --

3              THE COURT:  Whoa.  Whoa.  Whoa.  What do you mean

4    you couldn't get any evidence of that?

5              MS. YU:  Because those lawsuits that are filed in

6    terms of depositions or any of the evidence that came in

7    through their discovery, I could not get them because they

8    marked them confidential when they settled.

9              THE COURT:  Well, that's not a problem.

10             MR. POWLEY:  It isn't a problem, Your Honor.  They

11   didn't even ask for anything from the other lawsuits.  We

12   have produced under a protective order evidence.

13             THE COURT:  Did you ask for it, the details of

14   those lawsuits?

15             MS. YU:  Yes, Your Honor.  Their four defense

16   lawyers contacted me.

17             THE COURT:  No.  No.  Did you ask them for that

18   information?

19             MS. YU:  Yes, we did through discovery.

20             THE COURT:  Okay.  What type of discovery did you

21   ask for?

22             MS. YU:  It was in document demands.

23             THE COURT:  Okay.  And what was the response?

24             MS. YU:  Objections.  We didn't get them.

25             MR. POWLEY:  Your Honor, they didn't.  I will ask

```
 1    to look at their document requests because we produced that.
 2    Historically, when a protective order is in place, it's
 3    relevant and we produced it.
 4              THE COURT:  So you are saying they've got that
 5    information?
 6              MR. POWLEY:  No.  They've never asked for it.  If
 7    they had asked for it, we would have provided it.
 8              THE COURT:  Does somebody have that document
 9    request?
10              MS. YU:  No.  But I can get them.  I'm sorry, Your
11    Honor.
12              THE COURT:  Okay.  And you guys can't agree on
13    whether or not there was a request made for those documents?
14              MS. YU:  We made a broad request for all the
15    documents pertaining to their other lawsuits and this case.
16    We will double-check on that.
17              MR. POWLEY:  We don't believe they made that
18    request.  We've traditionally provided that in other
19    lawsuits.  It's been requested.  We can give them the
20    settlement agreements Monday from the other cases because
21    that's what we have.
22              THE COURT:  Okay.  I want you to turn it over.  I
23    want to know if any of those lawsuits in which there were
24    claims that were similar to the claims that are being made
25    in this case.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1            MR. POWLEY:  Every lawsuit that was filed and
 2   answered is of public record.  They have --
 3            THE COURT:  That's correct.
 4            MR. POWLEY:  They have all of that.
 5            THE COURT:  That's right.  And if they made that
 6   request to you, you need to turn that stuff over.
 7            MR. POWLEY:  Absolutely, Your Honor.
 8            THE COURT:  And you are going to do that because
 9   if you are going to sit here and ask for willfulness, for
10   them to be found willful, and you've got evidence that there
11   was confusion among other customers about whether or not
12   they could copy that, it needs to be turned over.
13            MR. POWLEY:  Absolutely, Your Honor.  We don't
14   have that evidence.  It doesn't exist and they didn't ask
15   for it.  I stand by that.
16            Anything that we have in the litigations, they can
17   look at.  We've produced everything.  We always do.  It's
18   speculation right now on their part.  There wasn't a
19   request.  We have not hid absolutely anything.
20            MS. YU:  Your Honor.
21            THE COURT:  What?
22            MS. YU:  We received -- they did produce a list, a
23   target list of other lawsuits, and that came through
24   Mr. George King's testimony.  He said that before coming to
25   his deposition -- this is a deposition that was taken on
```

1   September 11th -- he said that he had his assistant prepare

2   a list of targeted companies they were suing, which was

3   very, very similar to our lawsuits, and that list contains

4   all of the companies that they were targeting where the

5   administrative assistants were set up to -- and also, they

6   had other people --

7          MR. ANKROM:  You made this request for information

8   about other lawsuits?

9          MS. YU:  I will double-check on that.  I think it

10  was an overbroad request.  Yes, Your Honor.

11         THE COURT:  It was an overbroad request?

12         MS. YU:  Yes.  I will double-check on that.

13         THE COURT:  Okay.  Who is asking for salary

14  information of employees?

15         MR. POWLEY:  Your Honor, they made a motion to

16  limit that and we agree with their motion in limine.  We

17  will not seek or use that information of employees at this

18  trial.

19         THE COURT:  Okay.  Good idea.

20         Is there any other motions in limine?

21         MS. YU:  That's pretty much it for now because

22  those motions in limine, Your Honor --

23         THE COURT:  For now?  For now and forever?

24         MS. YU:  I'm sorry, Your Honor.  Not that we know

25  of because those motions in limine were filed before the

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1   cases were consolidated and that was only for one count, so

2   we don't believe so, Your Honor.

3          And to the extent that there are two more

4   depositions that they are taking next week, so we will

5   not -- so far, no.

6          MR. POWLEY:  Your Honor, there is one more issue

7   in their motions in limine.

8          THE COURT:  What's that?

9          MR. POWLEY:  Regarding the financial status of the

10  defendant, not the individuals but of the defendant.

11         THE COURT:  And that's relevant?

12         MR. POWLEY:  On statutory damages they contain

13  both a compensatory and punitive element.  In every

14  copyright case they look at for the deterrence factor the

15  financial status of the organization so their award can be

16  proper to deter the continued activity.

17         THE COURT:  And you want to get in what exactly?

18         MR. POWLEY:  Just information regarding the

19  financial resources or revenue of the defendant.

20         THE COURT:  And did you send out some discovery?

21         MR. POWLEY:  We did.  We sent out discovery and we

22  asked discovery and we got their SEC filings for their

23  revenue.  We asked the 30(b)(6) witness about that.  They

24  haven't complied and provided that information, but we've

25  requested it.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1            THE COURT:  Why shouldn't they have information
 2    concerning the financial status of your client?
 3            MS. YU:  Because the law is very clear in
 4    copyright cases you bifurcate liability and statutory
 5    damages.  The fact that they are --
 6            THE COURT:  Well, other than the fact that it
 7    ought to be bifurcated.
 8            MS. YU:  Yes, Your Honor.  The willfulness, it's
 9    highly prejudice and inflammatory because you don't get to
10    even damages or let alone willfulness until the jury decides
11    on liability first.
12            THE COURT:  Well, isn't it up to the court to
13    decide whether or not issues of --
14            Well, putting aside the issue of willfulness,
15    doesn't the jury need some sort of financial information to
16    decide whether or not compensatory -- is there a range of
17    compensatory damages?
18            MS. YU:  Yes.
19            THE COURT:  What's the range?
20            MS. YU:  750 to 30,000 for statutory.
21            MR. POWLEY:  And for willful it goes from 30,000
22    to 150,000 per work.
23            THE COURT:  Thank you.  So are you saying that you
24    are entitled to get into their financial worth before you
25    get to the issue of willfulness?
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              MR. POWLEY:  We are saying it is a factor
 2   regarding if the jury finds that statutory damages, which we
 3   are seeking and they are evaluating it, what element of that
 4   if it's willful should be.
 5              THE COURT:  So are you saying that the
 6   financial -- their finances is relevant to the issue of
 7   willfulness?
 8              MR. POWLEY:  Relevant to the issue of willfulness
 9   as far as sophistication of the organization and the award
10   of damages.
11              THE COURT:  Okay.  That's fine.  Okay.  And you
12   would agree, assuming the jury finds that there was a
13   copyright violation, once that's established, then they are
14   entitled -- to assessing willfulness, they are entitled to
15   know your financial status?
16              MS. YU:  That's correct.
17              THE COURT:  Okay.
18              MS. YU:  Once we get to -- it all operates just
19   like punitive damages and there are ample cases that have
20   held that it's highly prejudicial and it cannot.
21              THE COURT:  And there have been other cases that
22   say it can all go in there at once and the jury can be
23   instructed as to how they are supposed to use it.  Isn't
24   that true?
25              MS. YU:  That may be.  That's correct.  I think
```

```
 1    the court has discretion.  The court has broad discretion.
 2    And we've found cases in the Ninth Circuit that said -- even
 3    Apple, I think, I cited one of the cases Apple vs.
 4    Microsoft, that in copyright infringement cases liability
 5    has to be separated from damages because it's highly
 6    inflammatory and prejudicial, and also, it will streamline
 7    the evidence.  But the court --
 8              THE COURT:  I doubt very much -- well, go ahead.
 9              MS. YU:  The court has discretion for sure.
10              THE COURT:  Okay.  And whether the statute of
11    limitations applies or not, is that a question for the jury
12    or the court?
13              MS. YU:  I think the legal issue would be for the
14    court.
15              THE COURT:  You agree?
16              MR. POWLEY:  Your Honor, I think it's based on the
17    standard of Louis Vuitton whether we knew or had an
18    opportunity to know, and that's a question of fact that I
19    think goes to the jury.
20              THE COURT:  So you think the question of the
21    statute of limitations goes to the jury?
22              MR. POWLEY:  Yes, Your Honor.
23              THE COURT:  Okay.  When are you going to be able
24    to find out if you sent out any discovery requests?
25              MS. YU:  I will find out after the hearing, or if
```

1    you want me to go and call.

2            THE COURT:  When, today?

3            MS. YU:  Yes, today.

4            THE COURT:  Was there some sort of bonus given to

5    employees concerning if customers, if they identified who

6    were caught making copies?

7            MR. POWLEY:  If an employee identifies an

8    infringement and reports it, there is a $5,000 payment to

9    the employee.

10           THE COURT:  So, and how did their copying come to

11   your attention?

12           MR. POWLEY:  In October of 2011, we learned they

13   were trying to see if they could receive our publications

14   through our website, and they reached out to our sales and

15   customer service team or maybe our sales team and asked, you

16   know, we have 20 or 30 people, can we start getting a price

17   to get it directly from your website?

18           And the salesperson at the time said to them,

19   well, can you tell us how you are providing it now because

20   it's a very difficult thing to learn how on someone's secure

21   e-mail system that no one has access to if they are making

22   these, forwarding these copies.  And so they when they

23   called us the sales person asked can you tell us how you are

24   circulating the publication now?  And the person sent the

25   list showing the 85 people she refers it to.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              THE COURT:  So your salesperson gets a call from
 2    them saying we'd like to know if we can get your newsletter
 3    on the web?
 4              MR. POWLEY:  Yes.
 5              THE COURT:  Okay.  And in the course of that
 6    conversation the employee says, well, how are you
 7    circulating it now?
 8              MR. POWLEY:  Uh-huh.
 9              THE COURT:  And then their employee sends you the
10    list that shows that they are circulating this?
11              MR. POWLEY:  They are making copies and
12    distributing it, yes.
13              THE COURT:  And what exactly did they send?
14              MR. POWLEY:  They sent their internal distribution
15    list.
16              THE COURT:  Did they send a copy of an e-mail?
17              MR. POWLEY:  Yes, the copy of e-mails that had all
18    of the recipients.
19              THE COURT:  Did that employee receive a bonus?
20              MR. POWLEY:  He received, I believe, $5,000.
21              THE COURT:  Okay.  Now, in these other lawsuits,
22    were there employees who were receiving bonuses?
23              MR. POWLEY:  I think a few of the employees.  It's
24    a policy that they adopted later on.  There was a concern
25    that the sales staff when they report an infringement loses
```

1    the commission and the customer relationship, obviously.

2           THE COURT:  That's fine.  There may be a rationale

3    for why you were doing it.

4           MR. POWLEY:  Yes.

5           THE COURT:  But there are other lawsuits that you

6    filed as a result of employees turning their customers in or

7    notifying the -- let me try to put that a different way.

8           There was employees who had received a bonus for

9    notifying the company that their customers were making

10   copies?

11          MR. POWLEY:  Yes.  I believe there were a few

12   times of that in other lawsuits, yes, Your Honor.

13          THE COURT:  Were there any of the lawsuits that

14   asserted that they too were confused about whether or not

15   this was a single subscription?

16          MR. POWLEY:  No.  And there's been no allegations

17   in the other lawsuits of fraud against or anything of that

18   nature.

19          THE COURT:  I didn't ask you about fraud.  Is

20   there anybody who claimed that they were confused that they

21   had been making copies of these newsletters and circulating

22   them and then when it went electronic they just continued to

23   circulate them?

24          MR. POWLEY:  No, I don't believe so, Your Honor.

25          THE COURT:  Have you looked it?

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1           MR. POWLEY:  Yes.  We are pretty familiar with
 2     their litigation.  The transition occurred in 1999, and I
 3     don't -- I will review it again.  But to my knowledge right
 4     now, Your Honor, I don't think there's been times when
 5     people have said, oh -- because there is a difference
 6     between taking the one copy we discussed which used to be
 7     the case with a paper and having a routing slip and
 8     circulating that.  That's an ordinary, I bought a book at
 9     the book store, I'm giving it to my friend when I'm done
10     reading it type of thing.  It's not making a copy.
11           It's the situation now where the equivalent of
12     that prior to the digital age would be going to the
13     photocopier and making 16 copies and simultaneously passing
14     them out to everybody.
15           THE COURT:  Uh-huh.
16           MR. POWLEY:  Despite the warnings on the copyright
17     notice, people started doing it electronically.
18           THE COURT:  By the way, do you have a copy of the
19     notice?
20           MR. POWLEY:  We don't.  I apologize, Your Honor.
21     We looked.  We don't have a copy of the notice.
22           THE COURT:  Okay.  And when you changed your
23     subscription, is there a reason the company changed that?
24           MR. POWLEY:  The subscription remained -- we only
25     have subscription records back to about 2003, a copy of the
```

1   subscription agreement.  And it was from my review -- and

2   all the documents are on record -- it was the same to 2007.

3          And then in 2007, they tried to because of the

4   digital age and things, they changed their subscription

5   agreement.  And I believe the subscription agreement

6   remained the same from 2007 to 2011.

7          THE COURT:  Why did they make the change?

8          MR. POWLEY:  Part of it was to update language

9   regarding contract claims in it.  Part of it was to try to

10  make people aware that forwarding is willful.

11         THE COURT:  Well, but didn't the lawyers have any

12  input into that change?

13         MR. POWLEY:  Yes, Your Honor, we did.

14         THE COURT:  Okay.  And you'd been suing people?

15         MR. POWLEY:  The first lawsuit I believe was in

16  2006.  And it was basically a company policy change because

17  they felt prior to that, they found it's always customer

18  specific that someone may have been forwarding it.  They've

19  gone to that customer and said you really need to have a

20  license because they were aware.

21         In those situations they didn't take action, the

22  statute of limitations certainly applies and none of those

23  customers have ever been sued.  But they became aware

24  that -- they are considered one of the leading publications

25  in this industry and they were increasing the number of

1    reporters, the number of bureaus, and their subscription

2    loads were going down and so they had a concern that people

3    might be forwarding.  But finding that out is a hard thing

4    to do because it's not publicly available.

5          And so they just decided to make sure people took

6    their copyrights more seriously.  When they became aware of

7    someone, they started the policy of taking legal action.

8    For the first time in company history in 2006, they changed

9    their position where they never previously sued their

10   customers before.  But it's a hard thing to sue your

11   customer.  It doesn't lead to a good customer relationship

12   afterwards.  But it became important for them to really

13   survive.  Their publications also have no advertising.  It's

14   solely content, analytical content of their reporters.

15         THE COURT:  How many subscriptions do they have

16   now, subscribers?

17         MR. POWLEY:  I believe individual subscribers,

18   they have probably 600 maybe, and then they have site

19   licenses that companies subscribed for their whole location

20   or for their whole company, and they have 19 publications

21   other than the one that's at issue in this.  I think

22   their -- I believe their number of subscribers are 20- to

23   30,000 at this point.

24         THE COURT:  I'm sorry.  I think at the last

25   hearing you mentioned about how many lawsuits they've sued

```
 1    people for this type of copying.
 2            MR. POWLEY:  Yeah, I believe the total number of
 3    lawsuits at this point are 26, and two were withdrawn
 4    because when we started speaking with the client what was
 5    indication of infringement turned out not to be and the
 6    suits were withdrawn.  But I believe it's around 26, maybe
 7    27.
 8            THE COURT:  And you've given them that list?
 9            MR. POWLEY:  I don't think they've asked for that
10    list.  They've raised that list and we -- they asked our
11    30(b)(6) witness to come --
12            THE COURT:  In other words, so when the 30(b)(6)
13    witness came, he gave them a list?
14            MR. POWLEY:  They asked him to talk about the
15    other litigations.
16            THE COURT:  Uh-huh.
17            MR. POWLEY:  And he's in his 70s, a CFO, and he
18    prepared a list of the litigations to help his memory.
19            THE COURT:  That's fine.
20            MR. POWLEY:  We provided that to them when they
21    asked for it during the deposition.  And the request was the
22    amount expended on the lawsuit --
23            THE COURT:  All I really want to know is you've
24    given them the list of the lawsuits?
25            MR. POWLEY:  We have, Your Honor.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              THE COURT:  And it's got the case numbers?
 2              MR. POWLEY:  I think it just has the parties.
 3              THE COURT:  You didn't tell them where those cases
 4    were filed?
 5              MR. POWLEY:  They didn't request that, but we can.
 6              THE COURT:  Okay.
 7              MS. YU:  Yes, Your Honor.  It's all on PACER.
 8    That's how I found out.  And the earliest lawsuit was 2005
 9    and not 2006.
10              THE COURT:  So you've found the lawsuits?
11              MS. YU:  Yes.  And all you have to do is go
12    through all courts, yes, Your Honor.
13              THE COURT:  That's fine.  You found the lawsuits,
14    right?
15              MS. YU:  Yes.
16              THE COURT:  And you contacted some of those people
17    that were involved in the lawsuits, some of the lawyers?
18              MS. YU:  They contacted me, that's correct.  Their
19    defense attorneys contacted me.  And one --
20              THE COURT:  Why would they contact you?
21              MS. YU:  Because they said -- they did the same
22    thing I did.  They went on PACER and they just thought the
23    case was strange.
24              THE COURT:  How did they know that -- never mind.
25              So they contacted you?
```

```
1              MS. YU:  Right.  It's quite easy on PACER.

2              THE COURT:  Please.

3              MS. YU:  Yes, Your Honor.

4              THE COURT:  They contacted you, right?

5              MS. YU:  Yes.  Yes.

6              THE COURT:  And you asked them about their

7    lawsuits?

8              MS. YU:  Right.

9              THE COURT:  And they said what?

10             MS. YU:  They said that there is one case in

11   Pennsylvania that involved the same kind of the confusion

12   issue.  It's a United States Steel workers and I think they

13   have a summary judgment motion pending right now.  A number

14   of them wanted to know whether we can share information, but

15   they were concerned about the protective order and

16   confidentiality and they wanted to resolve those first.

17             But they said that they had the same issues.  It

18   all started out with targeting one person and then set them

19   up and then filed a lawsuit and then very similar facts.

20   And they said that looking at our case they thought it was

21   very, very similar and they wanted to have some kind of

22   joint effort to share information and they'd be more than

23   happy to come and support to trial, if necessary.

24             There was one librarian -- there are a number of

25   cases involving different individuals whom plaintiffs were
```

```
 1    targeting and that's where that target list comes into the
 2    issue of other lawsuits because Mr. King inadvertently said,
 3    oh, yeah, in preparation I had my assistant prepare this
 4    list.
 5                THE COURT:  Okay.
 6                MS. YU:  And that list contains all of the
 7    companies where they were targeting administrative
 8    assistants just like us.
 9                THE COURT:  How do you know -- is that your spin
10    on the list or is it just a list of lawsuits?
11                MS. YU:  List of targeted lawsuits where they
12    involved administrative --
13                THE COURT:  What do you mean targeted lawsuits?
14                MS. YU:  Targeted lawsuits meaning they are
15    looking for, just like our administrative assistant.
16                THE COURT:  How do you know that?
17                MS. YU:  Because Mr. King testified --
18                THE COURT:  Did he say that, that we were looking
19    for administrative assistants?
20                MS. YU:  No, the list says that.
21                THE COURT:  The list says we were looking for
22    administrative assistants?
23                MS. YU:  I'm sorry, Your Honor.
24                THE COURT:  Why are you looking at him?
25                MS. YU:  Because he took his deposition.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
1              THE COURT:  Okay.  Is that what the list says?
2              MR. MESEREAU:  It doesn't say it.  But here is
3    what happened, Your Honor:  During the deposition, he was
4    asked what he looked at to prepare for the deposition.  He
5    admitted that he had asked that his list be prepared.  The
6    list has the individuals who had the subscriptions.
7              THE COURT:  Yes.
8              MR. MESEREAU:  Then it had the companies they sued
9    because of those individuals.
10             THE COURT:  Okay.
11             MR. MESEREAU:  He lied about whether he knew who
12   those individuals in the third column were.  We then got the
13   person who prepared the list at his direction and said she
14   explained to him who the individuals were.  So the sum total
15   of the --
16             THE COURT:  Okay.  And so those people are who,
17   the people --
18             MR. MESEREAU:  They are secretaries,
19   administrative assistants, a librarian who they solicited to
20   get subscriptions and then sued the company for this kind of
21   thing.
22             THE COURT:  That's fine.  But the idea that -- the
23   list doesn't say these people were targeted?
24             MR. MESEREAU:  No, it doesn't say that.
25             THE COURT:  That's your spin on it?
```

```
 1              MR. MESEREAU:  That's our strong belief, yes, Your
 2    Honor.
 3              THE COURT:  Okay.
 4              MR. POWLEY:  May I add something, Your Honor?
 5              THE COURT:  Yeah, go ahead.
 6              MR. POWLEY:  The list doesn't say that.
 7              For instance, Bryan Joyce, the recipient at
 8    defendant, is a senior individual from 1999 prior to that.
 9              And the case that was referred that's pending in
10    the Western District of Pennsylvania, if they read the
11    pleadings that are of public record rather than making what
12    they've just asserted, there is no dispute about the
13    infringement.  They acknowledge that they took it and
14    distributed it.  It's more focused on damages, what's the
15    appropriate measure of damages.
16              THE COURT:  I don't think that's the issue --
17              MR. POWLEY:  Okay.
18              THE COURT:  -- really.  I think probably if you
19    asked all of these people they are going to say, yeah, we
20    copied it.
21              MR. POWLEY:  Uh-huh.
22              THE COURT:  And the issue as I see it, at least at
23    this point without more, is it sounds to me like whether or
24    not this really was done willfully and if there was
25    confusion about these lists or the notice or whether or not
```

1   they could circulate it, that's one thing.  But merely

2   having the list is not enough.

3           MS. YU:  Your Honor, the issue is more than

4   confusion.  The issue is whether we had permission because

5   we had license.  We had a company license.  And in all their

6   notices, Your Honor, it says don't forward unless you have

7   authorized appropriate license.  Every one of them says

8   that, and they concede that.  So the issue is did we have a

9   company license.  And they concede that that is the case.

10          THE COURT:  Okay.

11          MS. YU:  Your Honor?

12          THE COURT:  Yes.

13          MS. YU:  Had we known about all these concerns, we

14  would never have purchased.  Had we known that if it was not

15  for the company --

16          THE COURT:  You can save that for the jury.

17          MS. YU:  Yes, Your Honor.

18          THE COURT:  Okay.  We are going to send out this

19  order.  I assume you people have made up your minds that

20  this case is going to have to be tried.  There is no point

21  in trying to arrive at a settlement in this case?

22          MS. YU:  We had a mediation and I believe there

23  was ongoing discussions afterwards.

24          MR. POWLEY:  There is still discussions going on

25  with the mediator that assisted the parties on December 7th.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              THE COURT:  Okay.  Do you have any other meetings
 2    scheduled with this mediator?
 3              MR. POWLEY:  The last I spoke to the mediator was
 4    on Monday and he informed me he had a mediation that he had
 5    to travel to and he was coming back to California on
 6    Thursday and he was going to follow up with it and I have
 7    not heard from him since.  I expect to hear from him,
 8    though.
 9              THE COURT:  Okay.  Well, you guys are running out
10    of runway.  I hope you hear from him soon.
11              And have you met and conferred about the verdict
12    form in this case?
13              MS. YU:  We tried and we have agreed to follow up
14    on that, Your Honor.
15              MR. POWLEY:  On Tuesday and Wednesday we met
16    together at the defendant's office which they kindly offered
17    to us for 16 hours and worked through most of the issues, 15
18    or 16 hours.  That's one that we still have.  We can work
19    through and submit.  We submitted one that's disputed, but I
20    think we both believe we can work through it together.
21              MS. YU:  That's correct, Your Honor.
22              THE COURT:  Okay.  When do you plan on doing that?
23              MR. POWLEY:  We could meet further today and we
24    could meet next week and file it next week, if you'd like,
25    Your Honor.
```

```
 1              THE COURT:  Okay.  When?
 2              MR. POWLEY:  There's depositions going on the
 3    27th and 28th, so we could file it by -- I don't want to
 4    take the lead counsel from the deposition, so we could file
 5    it on --
 6              Susan, what would be good for you?  Because I know
 7    you are traveling to Houston.
 8              MS. YU:  Right.
 9              MR. POWLEY:  I just want to work with your
10    schedule.
11              MS. YU:  31st, Monday the 31st.
12              THE COURT:  I'm sorry.  What are you going to file
13    on the 31st?
14              MS. YU:  One special verdict form undisputed, Your
15    Honor.  We are trying to resolve it so that --
16              THE COURT:  Well, if you have a dispute, you have
17    a dispute.  But I'd think you would be able to work through
18    that.  So you are going to have the verdict form for us on
19    the 31st, and we are going to need proffers from -- witness
20    proffers from both sides concerning their affirmative
21    defenses.
22              MS. YU:  Your Honor?
23              THE COURT:  Yes.
24              MS. YU:  I wish to correct myself on one thing.  I
25    think counsel is correct on statute of limitations.  We
```

1   submitted it looks like joint jury instructions on statute

2   of limitations, so that will be an issue for the jury.  I've

3   already agreed to that.

4           THE COURT:  I'm not sure about that, but we will

5   figure it out.

6           Okay.  Let's have your proffers by January 4th as

7   to any affirmative defenses.  We will have your verdict form

8   on the 31st.  And we are going to need another pretrial

9   exhibit stipulation.  Let's see if we can have that on the

10  31st as well.  And the remaining motions in limine are these

11  other lawsuits.

12          And I'm sorry, what are you offering the other

13  lawsuits to show?

14          MS. YU:  Other lawsuits to demonstrate that they

15  had an ample opportunity to pursue the copyright

16  infringement action.

17          THE COURT:  What else?

18          MS. YU:  Also, it goes to demonstrate our fraud

19  claim that fraud by concealment that there is a --

20          THE COURT:  What did they conceal?

21          MS. YU:  Conceal on the invoices.

22          THE COURT:  What did they conceal on the invoices?

23          MS. YU:  Conceal all the terms that it was for one

24  person as opposed to --

25          THE COURT:  What else?

1           MS. YU:  -- anyone at the other company.  And also

2    having -- and also willfulness.

3           THE COURT:  Okay.  This joint statement of the

4    case --

5           MS. YU:  We have not yet filed the recent one.  We

6    are working on that, Your Honor.

7           THE COURT:  That's good because this one looks

8    like an opening statement.

9           Okay.  So you are not going to be seeking any

10   evidence of their clients' salaries --

11          MR. POWLEY:  No.

12          THE COURT:  -- their employees' salaries?

13          And the only other issue is the extent to which

14   you will be able to get into their financial information?

15          MR. POWLEY:  Correct, Your Honor.

16          THE COURT:  Okay.  And at what point during the

17   trial?

18          MR. POWLEY:  Correct, Your Honor.

19          THE COURT:  Okay.  So the only real issue we have

20   to sort of resolve is the other lawsuits, right?

21          MS. YU:  Yes, Your Honor.

22          THE COURT:  And the information regarding the

23   other lawsuits, is that just going to be this deposition

24   testimony that you are going to be offering?

25          MS. YU:  No.  And also live testimony from

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1   Mr. Hitchcock who testified yesterday as a 30(b)(6) witness.
 2              THE COURT:  Sorry.  Who is Mr. Hitchcock?
 3              MS. YU:  John Hitchcock is their managing director
 4   of sales and marketing for plaintiffs.
 5              THE COURT:  Okay.  And what's he going to say?
 6              MS. YU:  He testified about all the lawsuits that
 7   they have implemented to devise this it's called global
 8   enterprise licenses, he said.  And that global enterprise
 9   licenses is that once you settle -- he said there were 15
10   publications they currently have including Oil Daily.  Oil
11   Daily happens to be one of the 15 publications.
12              So once they sue a company that has been
13   subscribing just to the Oil Daily newspaper just like we
14   have, one person has, and once they sue and when they
15   settle, they offer them a global enterprise license they
16   call it.  And he said it happened at a very high level and
17   that he'd meet with the high level people and then
18   ultimately he admitted that was part of the lawsuit.
19              And that high level global enterprise license will
20   give each company for settling with them, you stay on as a
21   customer for all the employees of the company unlimited and
22   unlimited access to every publication for three years.
23              THE COURT:  Okay.  And that's relevant to what?
24              MS. YU:  That's relevant to demonstrate that the
25   integrity of this lawsuit that all of their -- their
```

1    revenues are generated, virtually all of their revenues are

2    generated from the lawsuits.  They have no other revenues.

3    The testimony from the --

4            THE COURT:  You are jumping to that from the fact

5    that they are giving you -- the people who settle their

6    lawsuits, these 24 lawsuits, that they then get the

7    privilege of subscribing to all of their publications?

8            MS. YU:  No.  I'm not jumping to that because

9    they've testified that their CFO, their officers and even

10   the managing director of sales and marketing said they don't

11   know how much money they generate on publications.  That's

12   their testimony.

13           THE COURT:  So what?

14           MS. YU:  But they do know about the lawsuits.  And

15   they said that their targeted revenues matches up with the

16   lawsuit -- I'm sorry, that they generate all of the monies

17   that they get through the lawsuits and not from the

18   publications.  It goes to demonstrate that it proves our

19   fraud claim because they want to --

20           THE COURT:  It proves your fraud claim?

21           MS. YU:  Yes, fraud by concealment.  Because why

22   else -- if their objective --

23           THE COURT:  I doubt it.  You can brief it, but I

24   kind of doubt it.  You can give me the deposition testimony.

25   I will take a look at the deposition testimony.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              MS. YU:  But, Your Honor, if they are trying to
 2    protect their copyrights --
 3              THE COURT:  I'm sorry?
 4              MS. YU:  If they are trying to protect their
 5    copyrights --
 6              THE COURT:  Just like everybody else does.
 7              MS. YU:  Right.  They could easily -- there was
 8    never a warning whatsoever.
 9              THE COURT:  What does that have to do with the
10    idea that -- just go ahead and brief it and I will take a
11    look at it, and you can give me the deposition testimony and
12    I will take a look at that.
13              MS. YU:  Yes, Your Honor.
14              THE COURT:  Okay.  So you are going to owe me a
15    joint statement of the case.  Let's have that by the 31st.
16    Let's have the new joint pretrial exhibit stipulation by the
17    31st, verdict form by the 31st, and the proffers as to the
18    affirmative defenses by January 4th.
19              And there will be a minute order that will go out
20    today.  You can pick a copy up from the clerk when you
21    leave.  We will have it for you in a couple minutes.  And as
22    I understand it there is no dispute as to the deposition
23    testimony except for the fact that he's going to be getting
24    into other lawsuits.
25              Does somebody have a copy of his deposition
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1   testimony?

2          MS. YU:  Not on me.

3          MR. POWLEY:  Excuse me.  I think it just occurred

4   to me it's an exhibit to our response to the motion in

5   limine.  The deposition transcript language is there.

6          THE COURT:  That you are objecting to?

7          MR. POWLEY:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MS. YU:  Oh, I'm sorry, Your Honor.  It looks like

10   I do have his exhibits here.  I'm sorry.  His deposition

11   testimony is here as well as the list of the targeted

12   lawsuits.  I have it here.

13          THE COURT:  Okay.

14          MS. YU:  Would you like to see it, Your Honor?

15          THE COURT:  No.

16          MS. YU:  Okay.

17          THE COURT:  I think he indicated that there is a

18   copy of the deposition testimony in the motion in limine, so

19   I will take a look at that.

20          Does that summarize the testimony that you want to

21   offer?

22          MS. YU:  I think it's actually more because we've

23   designated the testimony and gave it to counsel, but I think

24   this would include it.

25          THE COURT:  Okay.  You can give the clerk a copy

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1    of what you are going to be offering and I will take a look

2    at that.

3              Anything else that we need to cover today?

4              MR. POWLEY:  The only thing, Your Honor, that we

5    talked about last time that we have not really been able to

6    find a clear path on is the pre-2009 ESI.  We've requested

7    that information.  Defendant's concern is that they are on

8    backup tapes that need to be protected for other matters at

9    a litigation hold.

10             We offered the other day possibly either sampling

11   certain tapes.  When we were here last, you suggested they

12   provide them to us.  They have concerns that they could get

13   damaged and lose -- it won't be properly preserved.

14             We've asked for it in discovery.  We suggested

15   that as an alternative we could do sampling.  A witness --

16   we have a 30(b)(6) deposition next week -- could state for

17   the periods of time the best that can be recalled how many

18   people received the publication.  And we haven't -- I

19   understand they are still considering that, but that's the

20   only thing that hasn't really been worked out.  And their

21   discovery response to that is actually due today.

22             THE COURT:  Okay.  Do you have a response for

23   them?

24             MS. YU:  Yes, Your Honor.  This issue was already

25   litigated and resolved by Judge Segal back in July and we

```
 1    provided the declaration of the IT person, an expert
 2    explaining how these backup tapes worked.
 3              THE COURT:  Okay.  Well, whatever Judge Segal
 4    ruled, it's now before me.
 5              MS. YU:  Yes, Your Honor.  We made an offer
 6    because these tapes were on litigation hold, not just for
 7    this case, but for all the other cases in which defendants
 8    are a party subject to all of the other district court cases
 9    or other cases where whenever you have a case, whenever
10    there is a lawsuit, there is a litigation hold.  So we made
11    an offer.
12              THE COURT:  Yes, I know.  Go ahead.
13              MS. YU:  These are in storage in Houston.  They
14    are more than welcome to come and take a look at them but
15    subject to a protective order that will allow us to make
16    sure that we don't violate any other litigation hold orders
17    we have in other cases, including this one, and we do not
18    want to run the risk of --
19              THE COURT:  You could provide those tapes.  So the
20    next time you are here, you guys work this out.  If there is
21    a need for a protective order, fine, you've got it.  So work
22    it out.  But do not come back here again with this
23    Judge Segal or about some other case.  Work it out.
24              MS. YU:  Yes, Your Honor.
25              THE COURT:  That goes for both sides.
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1              MR. POWLEY:  Absolutely, Your Honor.
 2              THE COURT:  Work this out.
 3              MR. POWLEY:  Absolutely, Your Honor.
 4              THE COURT:  And you make sure, you take a look.
 5    Make sure that they provided you with this discovery request
 6    for this other litigation.
 7              MR. POWLEY:  Absolutely.
 8              THE COURT:  And if they did, turn it over.
 9              MR. POWLEY:  Absolutely.  Absolutely.
10              THE COURT:  So work it out.
11              MS. YU:  Yes, Your Honor.
12              THE COURT:  Because, believe me, you don't want me
13    to have to work it out.  So whoever needs to get with those
14    tapes, is just going to have to do it.  Or they are going to
15    need a real good reason why they couldn't, and I haven't
16    heard one yet.  Okay.
17              MR. POWLEY:  Thank you, Your Honor.
18              THE COURT:  Anything else?
19              MS. YU:  I think there was an OSC.
20              THE COURT:  Oh, yeah, the OSC.  Well, here is the
21    results of the OSC.  I have this -- I got your declaration.
22    I'm glad that -- I don't know why you needed my prompting to
23    do what you were supposed to do, and I guess one of the
24    lawyers said, well, I apologize for any inconvenience.
25              I don't think it's an issue of inconvenience.  The
```

1   issue is I've got two sets of lawyers here.  They are very

2   experienced and they simply chose to do what they wanted to

3   do rather than follow the court's orders.

4          The court's orders were designed for the orderly

5   administration of justice and to get at the truth and so

6   that we can have an orderly presentation at trial, and it's

7   really that simple.  There are a lot of cases that are lined

8   up here ready to go to trial and I don't have time to

9   babysit lawyers.

10          So, after looking at all the declarations, what

11  the court's going to order, the court -- and you are going

12  to get sanctioned.  And the court's going to order that each

13  side, you can pay $750 to the clerk of the court for

14  violating the court's orders or you can pay $500 and donate

15  it to -- either with books or toys to a public school within

16  a five-mile radius of the court, your choice.

17          And you should submit a declaration by a week from

18  today letting us know which one you'd like to avail yourself

19  of.  So, $750 payable by the 28th to the district court or

20  you can pay $500, you can donate $500 in toys, books or

21  cash -- well, books or toys to a local public school within

22  a five-mile radius of the court.

23          And now we need another date when we can finalize

24  our pretrial conference.  How is January the 4th?  Or we can

25  do the 28th, or we can do January 4th.

```
 1              MR. POWLEY:  January 4th is fine, Your Honor.
 2              THE COURT:  We can do January 28th, January 3rd,
 3     January 4th.
 4              MS. YU:  Is the 3rd okay, January 3rd?
 5              MR. POWLEY:  I will do the 3rd, yes.
 6              MS. YU:  Is the 3rd okay, Your Honor?
 7              THE COURT:  That's fine, I think.
 8              Okay.  How is 1:30?
 9              MS. YU:  Yes, Your Honor.
10              THE COURT:  Okay.  January 3rd at 1:30.  And be in
11     a position to report back as to what the status of your
12     mediation efforts are.
13              And, I'm sorry, how many witnesses are you
14     calling?
15              MR. POWLEY:  There is five employees; one, two,
16     three, four, five, and then one, two, three, four, five,
17     six, seven, eight, nine, ten, I think ten, Your Honor.  Both
18     parties are calling some of the same witnesses.
19              THE COURT:  Okay.
20              MR. POWLEY:  Your Honor, I'm sorry, 14.
21              THE COURT:  How many of those 14 are being
22     called -- are also being called by the defense; do you know?
23              MR. POWLEY:  I think every -- I think all of them,
24     almost all of them.  All but one, I believe.
25              THE COURT:  And how many witnesses are the defense
```

1  calling?

2      MS. YU:  It looks like it's about the same except

3  for one additional witness who is only going to come in to

4  authenticate a document.  If we have a stipulation on that,

5  we don't need to call that person.

6      THE COURT:  Uh-huh.  How many days do you think

7  you are going to need?

8      MR. POWLEY:  For our case in chief right now, two

9  to three, Your Honor.

10     THE COURT:  How many days are you going to need?

11     MS. YU:  About two days.

12     THE COURT:  Well, both sides look over their

13  witness lists, make sure that these people are necessary

14  because at this point I'm inclined to say that we are going

15  to tell the jury that we are going to be done on Friday of

16  that week and whatever time that is, I will divide it up

17  among you equally and you use it however you like, but

18  that's all the time you are going to have.  And that

19  includes your opening statements, your closing arguments,

20  cross-examination, direct.

21     And when we get together on the 4th, you can tell

22  me why that -- we will take a look at these witnesses and

23  you can tell me why you think you are going to need that

24  time.  Maybe we can even finish it quicker.  It seems like a

25  pretty straightforward case to me.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
 1          Have any of your former customers signed up for
 2   this expanded program after they had settled those lawsuits?
 3          MR. POWLEY:  It's never been after they settled,
 4   Your Honor.  It's been part of settlements at times.
 5   There's been several instances where there's been no
 6   license, but in many of the cases because they are
 7   customers, rather than saying pay for damage, they paid for
 8   a license as part of the settlement so they could get it.
 9          THE COURT:  A license for that magazine or a
10   license for other publications as well?
11          MR. POWLEY:  A license for the other publications
12   as well.  In other litigations, they've typically subscribed
13   to other publications too.  And the global license was
14   just -- it's elective.  It's not compulsory.  It's not
15   provided afterwards.  It's based on the settlement between
16   the parties.  And there's been several instances where
17   there's been no license and fee settlement amounts paid in
18   excess of what the global license costs would be.
19          THE COURT:  Uh-huh.  What's the cost of a total
20   license?
21          MR. POWLEY:  Three-year global license, it depends
22   on the size of the company because it's priced per amount of
23   people, but in this situation a three-year global license to
24   all of the publications is $1.74 million.
25          THE COURT:  Uh-huh.  How much was the license for
```

1   this *Oil Daily*?

2           MR. POWLEY:  For their original subscription?

3           THE COURT:  Uh-huh.

4           MR. POWLEY:  For one person it was $1800 per year

5   up to I think recently now it's 2600 per year for one

6   person.

7           THE COURT:  Okay.  You are telling me that your

8   settlement discussions are ongoing?

9           MR. POWLEY:  That's correct.

10          THE COURT:  Would you characterize whether or not

11  you've made any progress or you are still the same or you

12  are far apart?

13          MR. POWLEY:  I think we've made progress.  I still

14  think we are far apart.

15          THE COURT:  Uh-huh.  Okay.  Anything else?

16          MR. POWLEY:  Not today, Your Honor.  Thank you.

17          THE COURT:  Okay.  All right.  We are going to --

18  if the case does not resolve, we are going to put a jury in

19  the box.  I think I may have told you this before so I don't

20  need to repeat myself.  Have we gone over jury selection?

21          MR. POWLEY:  I don't think so, Your Honor.

22          THE COURT:  We are going to put 14 people in the

23  box.  Each side is going to have three peremptory

24  challenges.  You can exercise your peremptories as to any of

25  the 14 in the box.  The first eight are the jury.

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

1                If you exercise the peremptories, for example, as

2     to Juror No. 2, Juror No. 9 is going to take Juror No. 2's

3     place.  If you pass, you lose.  You lose that challenge.

4     Before you announce a peremptory, you should confer with the

5     other side so if there is going to be a motion concerning

6     that peremptory, we will take it up at sidebar.

7                Any questions?

8                MS. YU:  No, Your Honor.

9                MR. POWLEY:  No, Your Honor.

10               THE COURT:  Okay.  And Juror Number 1 will be

11    seated on the first seat on the first row closest to me and

12    we will fill up seven and then Juror No. 8 will be on the

13    first seat in the second row closest to me.

14               MR. POWLEY:  Okay.

15               THE COURT:  Okay.  If there is nothing else, thank

16    you very much and we will see everybody on January 3rd at

17    1:30.

18               MS. YU:  Thank you very much.

19               MR. POWLEY:  Thank you, Your Honor.

20               THE COURT:  Thank you.

21               (At 3:10 p.m. proceedings were adjourned.)

22

23

24

25

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

```
1                        --oOo--

2                      CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  December 26, 2012

13

14

15                         /S/____WIL S. WILCOX _____

16                          U.S. COURT REPORTER
                               CSR NO. 9178.
17

18

19

20

21

22

23

24

25
```

*Los Angeles, California; Friday, December 21, 2012; 1:34 P.M.*

**$**

$1.74 [1] 63/24
$1.74 million [1] 63/24
$1800 [1] 64/4
$5,000 [3] 13/9 36/8 37/20
$500 [3] 60/14 60/20 60/20
$750 [2] 60/13 60/19

**-**

--oOo [1] 66/1
-oOo [1] 3/2

**/**

/S [1] 66/15

**1**

10013 [2] 2/5 2/17
10390 [1] 2/10
10556 [2] 1/8 3/3
11-10556 [2] 1/8 3/3
1177 [1] 2/12
11th [1] 31/1
14 [4] 61/20 61/21 64/22 64/25
144 [2] 4/9 5/5
15 [3] 49/17 53/9 53/11
150,000 [1] 33/22
16 [3] 39/13 49/17 49/18
177 [1] 4/10
19 [1] 41/20
1996 [4] 7/25 8/6 15/18 18/11
1999 [8] 7/24 14/4 15/9 15/11 15/12
 19/20 39/2 47/8
1:30 [3] 61/8 61/10 65/17
1:34 [2] 1/16 3/1

**2**

2's [1] 65/2
20 [2] 36/16 41/22
200 [1] 14/3
2000 [6] 8/5 8/6 15/11 15/16 15/19 18/20
2001 [2] 15/11 15/16
2002 [1] 15/16
2003 [1] 39/25
2004 [5] 7/25 8/6 8/8 18/11 18/11
2005 [7] 13/20 16/13 16/15 17/7 19/25
 23/12 43/8
2006 [3] 40/16 41/8 43/9
2007 [12] 8/8 8/11 8/15 8/23 9/4 14/5
 14/14 22/3 23/15 40/2 40/3 40/6
2009 [7] 4/13 4/14 18/4 18/5 18/18 18/20
 57/6
2011 [7] 8/11 14/19 17/16 17/24 19/8
 36/12 40/6
2012 [5] 1/16 3/1 17/23 17/25 66/12
21 [3] 1/16 3/1 17/24
212 [2] 2/6 2/17
213 [1] 1/22
220 [1] 2/11
226-5054 [2] 2/6 2/17
24 [1] 54/6
26 [3] 42/3 42/6 66/12
2600 [1] 64/5
27 [1] 42/7
27th and [1] 50/3
28 [1] 66/6
2849 [1] 1/22
28th [4] 11/15 50/3 60/25 61/2
28th to [1] 60/19
290-2849 [1] 1/22
2ND [2] 2/5 2/16

**3**

30 [9] 13/12 19/23 22/25 32/23 36/16

42/11 42/12 53/1 57/16
30,000 [3] 33/29 33/31 41/23
304 [2] 2/4 2/16
310 [1] 2/12
312 [1] 1/21
31st [9] 50/11 50/11 50/13 50/19 51/8
 51/10 55/15 55/17 55/17
321 [1] 4/8
3:10 [1] 65/21
3rd [7] 61/2 61/4 61/4 61/5 61/6 61/10
 65/16

**4**

432-A [1] 1/21
4th [7] 51/6 55/18 60/24 60/25 61/1 61/3
 62/21

**5**

5054 [2] 2/6 2/17

**6**

600 [1] 41/18
6th [1] 17/23

**7**

70s [1] 42/17
750 [1] 33/20
753 [1] 66/5
789-1177 [1] 2/12
7th [1] 48/25

**8**

85 [1] 36/25

**9**

90012 [1] 1/21
90025 [1] 2/11
9178 [2] 1/20 66/16

**A**

able [5] 18/16 35/23 50/17 52/14 57/5
about [35]
above [1] 66/8
above-entitled [1] 66/8
absolutely [9] 25/25 30/7 30/13 30/19
 59/1 59/3 59/7 59/9 59/9
access [2] 36/21 53/22
acknowledge [1] 47/13
act [1] 27/8
action [3] 40/21 41/7 51/16
actively [2] 22/23 23/2
activity [1] 32/16
actual [2] 17/14 17/17
actually [5] 7/24 18/13 20/22 56/22 57/21
add [1] 47/4
added [1] 23/15
additional [1] 62/3
adjourned [1] 65/21
administration [1] 60/5
administrative [10] 7/20 14/24 23/20 31/5
 45/7 45/12 45/15 45/19 45/22 46/19
admitted [2] 46/5 53/18
admonition [1] 26/10
adopt [1] 17/17
adopted [1] 37/24
advertising [1] 41/13
affirmative [10] 6/20 9/23 9/24 10/1 10/4
 20/8 20/9 50/20 51/7 55/18
after [5] 14/23 35/25 60/10 63/2 63/3
afternoon [5] 3/7 3/10 3/14 3/18 3/22
afterwards [3] 41/12 48/23 63/15
again [4] 9/2 16/5 39/3 58/22
against [2] 23/11 38/17
age [2] 39/12 40/4

ago [1] 23/5
agree [5] 24/23 29/12 31/16 34/12 35/15
agreed [3] 27/24 49/13 51/3
agreement [14]
agreements [4] 7/7 25/10 26/4 29/20
ahead [4] 35/8 47/5 55/10 58/12
al [2] 1/6 1/10
all [64]
ALL-AMERICAN [1] 1/9
allegations [1] 38/16
alleged [1] 17/6
allow [1] 58/15
almost [1] 61/24
alone [1] 33/10
already [2] 51/3 57/24
also [15]
alternative [1] 57/15
always [4] 19/9 27/6 30/17 40/17
AMERICAN [4] 1/9 3/4 3/9 3/12
among [2] 30/11 62/17
amount [2] 42/22 63/22
amounts [1] 63/17
ample [4] 13/16 18/23 34/19 51/15
analytical [1] 41/14
ANDERSON [1] 1/4
Angeles [4] 1/15 1/21 2/11 3/1
ANKROM [2] 2/15 3/19
announce [1] 65/4
another [2] 51/8 60/23
answer [1] 27/18
answered [1] 30/2
any [38]
anybody [2] 18/6 38/20
anyone [2] 25/13 52/1
anything [9] 8/1 15/6 28/11 30/16 30/19
 38/17 57/3 59/18 64/15
apart [2] 64/12 64/14
apologetic [1] 26/15
apologies [1] 26/9
apologize [3] 6/6 39/20 59/24
appearances [2] 2/1 3/6
appearing [5] 3/8 3/11 3/15 3/19 10/13
Apple [2] 35/3 35/3
applied [1] 17/15
applies [3] 23/19 35/11 40/22
apply [1] 18/2
appropriate [2] 47/15 48/7
Araceli [3] 5/18 6/3 14/24
are [172]
aren't [4] 18/8 21/19 24/11 24/20
arguments [1] 62/19
arose [1] 16/24
around [4] 10/25 11/7 17/18 42/6
arrive [1] 48/21
as [49]
aside [2] 12/9 33/14
ask [11] 7/10 10/23 21/25 28/11 28/13
 28/17 28/21 28/25 30/9 30/14 38/19
asked [18]
asking [3] 7/2 21/19 31/13
assert [2] 22/9 22/12
asserted [3] 9/23 38/14 47/12
assessing [1] 34/14
assistant [5] 7/20 14/24 31/1 45/3 45/15
assistants [6] 23/20 31/5 45/8 45/19
 45/22 46/19
assisted [1] 48/25
assume [2] 20/6 48/19
assumed [1] 9/12
assuming [1] 34/12
attention [4] 24/3 24/7 26/15 36/11
attorneys [1] 43/19
authenticate [1] 62/4
authorized [1] 48/7

## A

automatically [1] 22/20
avail [1] 60/18
available [1] 41/4
award [2] 32/15 34/9
aware [5] 25/3 40/10 40/20 40/23 41/6

## B

babysit [1] 60/9
back [23]
backup [2] 57/8 58/2
barred [3] 4/14 4/19 18/5
based [7] 4/18 7/5 9/17 15/15 26/3 35/16 63/15
basically [1] 40/16
basis [3] 12/8 21/12 22/17
be [52]
Bear [4] 17/12 17/15 17/17 20/9
became [3] 40/23 41/6 41/12
because [61]
been [22]
before [13] 9/22 14/18 14/19 16/20 21/18 23/22 30/24 31/25 33/24 41/10 58/4 64/19 65/4
began [3] 15/10 15/11 15/20
begin [1] 3/23
beginning [1] 15/5
behalf [4] 3/8 3/11 3/15 3/19
behavior [1] 10/21
being [9] 4/16 10/11 11/13 12/25 20/17 25/5 29/24 61/21 61/22
belief [1] 47/1
believe [18]
believing [1] 21/13
best [1] 57/17
between [4] 4/3 15/18 39/6 63/15
bifurcate [1] 33/4
bifurcated [1] 33/7
bonus [4] 13/8 36/4 37/19 38/8
bonuses [1] 37/22
book [3] 20/17 39/8 39/9
books [3] 60/15 60/20 60/21
both [9] 5/18 7/24 8/24 32/13 49/20 50/20 58/25 61/17 62/12
bought [1] 39/8
BOULEVARD [1] 2/10
box [3] 64/19 64/23 64/25
brackets [1] 23/17
brief [2] 54/23 55/10
bring [1] 26/7
broad [2] 29/14 35/1
broadcasting [1] 24/6
brought [1] 26/14
Bryan [1] 47/7
bureaus [1] 41/1
button [1] 24/6

## C

CA [2] 2/11 3/1
CALIFORNIA [5] 1/2 1/15 1/21 20/19 49/5
call [5] 10/1 36/1 37/1 53/16 62/5
called [5] 13/6 36/23 53/7 61/22 61/22
calling [5] 3/10 10/5 61/14 61/18 62/1
came [3] 28/6 30/23 42/13
can [46]
can't [8] 16/1 17/18 18/22 20/22 26/17 26/20 26/22 29/12
cannot [1] 34/20
care [1] 13/22
cares [1] 13/23
carried [1] 19/9
case [26]

## cases [18]
cash [1] 60/21
caught [1] 36/6
CENTRAL [1] 1/2
certain [4] 9/23 10/17 11/3 57/11
certainly [2] 16/10 40/22
CERTIFICATE [1] 66/2
certified [1] 4/15
certify [1] 66/5
CFO [2] 42/17 54/9
challenge [1] 65/3
challenges [1] 64/24
change [8] 11/5 14/14 14/17 15/2 15/2 40/7 40/12 40/16
changed [8] 14/18 14/19 15/7 23/23 39/22 39/23 40/4 41/8
changing [1] 14/20
characterize [1] 64/10
check [3] 29/16 31/9 31/12
chief [2] 11/25 62/8
choice [2] 15/21 60/16
chose [1] 60/2
Circuit [4] 17/13 17/15 17/16 35/2
circulate [3] 16/3 38/23 48/1
circulating [6] 18/25 36/24 37/7 37/10 38/21 39/8
cited [1] 35/3
claim [4] 4/22 51/19 54/19 54/20
claimants [2] 3/8 3/12
claimed [1] 38/20
claiming [1] 22/22
claims [8] 4/18 4/23 13/17 18/16 18/17 29/24 29/24 40/9
clear [2] 33/3 57/6
clearly [1] 6/2
clerk [4] 9/21 55/20 56/25 60/13
client [11] 7/13 18/25 19/22 20/4 20/13 21/10 21/13 22/18 22/20 33/2 42/4
client's [1] 6/2
clients [5] 6/22 9/16 25/3 25/16 26/5
clients' [1] 52/10
closest [2] 65/11 65/13
closing [1] 62/19
Code [1] 66/6
column [1] 46/12
come [9] 16/12 24/3 24/6 36/10 42/11 44/23 58/14 58/22 62/3
comes [2] 26/23 45/1
coming [2] 30/24 49/5
commission [1] 38/1
companies [13] 13/20 13/21 14/7 16/13 21/16 23/11 26/11 26/13 31/2 31/4 41/19 45/7 46/8
company [25]
company's [1] 13/11
compensatory [3] 32/13 33/16 33/17
complete [2] 9/5 10/3
complied [1] 32/24
compulsory [1] 63/14
conceal [4] 51/20 51/21 51/22 51/23
concealment [2] 51/19 54/21
concede [2] 48/8 48/9
concern [3] 37/24 41/2 57/7
concerned [2] 14/10 44/15
concerning [4] 33/2 36/5 50/20 65/5
concerns [2] 48/13 57/12
concurrently [1] 26/6
conduct [1] 7/9
confer [2] 6/7 65/4
conference [3] 1/17 60/24 66/10
conferred [2] 4/2 49/11
confidential [5] 27/16 27/19 27/21 27/25 28/8
confidentiality [1] 44/16

## conformance [1] 66/9
confused [4] 25/20 25/25 38/14 38/20
confusion [9] 16/21 24/7 24/20 24/22 27/14 30/11 44/11 47/25 48/4
considered [1] 40/24
considering [1] 57/19
consolidated [1] 32/1
constructive [4] 17/14 17/18 20/10 20/11
construe [1] 23/19
contact [1] 43/20
contacted [6] 28/16 43/16 43/18 43/19 43/25 44/4
contain [1] 32/12
contains [2] 31/3 45/6
content [2] 41/14 41/14
continued [2] 32/16 38/22
contract [1] 40/9
conversation [1] 37/6
copied [3] 11/7 20/18 47/20
copies [17]
copy [24]
copying [7] 21/4 21/13 21/24 22/16 22/19 36/10 42/1
copyright [25]
copyrights [3] 41/6 55/2 55/5
correct [21]
cost [1] 63/19
costs [1] 63/18
could [21]
couldn't [3] 16/2 28/4 59/15
counsel [5] 2/1 3/6 50/4 50/25 56/23
count [1] 32/1
counter [4] 3/8 3/12 3/16 3/20
counter-claimants [2] 3/8 3/12
counter-defendants [1] 3/20
counterclaim [1] 6/24
couple [1] 55/21
course [2] 7/9 37/5
court [16]
court's [5] 60/3 60/4 60/11 60/12 60/14
courts [1] 43/12
cover [3] 26/22 27/1 57/3
cross [1] 62/20
cross-examination [1] 62/20
CSR [1] 1/20 66/16
currently [1] 53/10
customer [7] 36/15 38/1 40/17 40/19 41/11 41/11 53/21
customers [18]
cut [2] 18/12 18/21
CV [2] 1/8 3/3

## D

Daily [8] 14/4 19/25 21/7 24/4 53/10 53/11 53/13 64/1
damage [1] 63/7
damaged [1] 57/13
damages [10] 32/12 33/5 33/10 33/17 34/2 34/10 34/19 35/5 47/14 47/15
date [2] 60/23 66/12
day [2] 26/21 57/10
days [3] 62/6 62/10 62/11
decade [1] 23/1
decades [1] 19/14
December [7] 1/16 3/1 17/16 17/24 19/20 48/25 66/12
December 7th [1] 48/25
decide [2] 33/13 33/16
decided [1] 41/5
decides [1] 33/10
decision [2] 17/13 17/15
declaration [3] 58/1 59/21 60/17
declarations [1] 60/10
declaratory [2] 6/21 6/24

## D

defendant [8] 2/8 3/11 5/18 10/20 32/10
 32/10 32/16 47/8
defendant's [3] 5/21 49/16 57/7
defendants [6] 1/11 3/8 3/16 3/20 26/9
 58/7
defense [6] 6/20 23/21 28/15 43/19 61/22
 61/25
defenses [7] 9/23 9/24 10/1 10/4 50/21
 51/7 55/18
deleted [1] 14/22
demands [1] 28/22
demonstrate [4] 51/14 51/18 53/24 54/18
depending [1] 11/19
depends [1] 63/21
deposition [1] 57/24
depositions [3] 28/6 32/4 50/2
describing [2] 6/3 10/21
designated [2] 12/2 56/23
designations [1] 12/6
designed [1] 60/4
Despite [1] 39/16
details [1] 28/13
deter [1] 32/16
determined [1] 10/16
deterrence [1] 32/14
devise [1] 53/7
did [34]
didn't [16]
difference [1] 39/5
different [4] 7/21 22/2 38/7 44/25
difficult [1] 36/20
digital [2] 39/12 40/4
direct [1] 62/20
direction [1] 46/13
directly [3] 13/5 13/14 36/17
director [2] 53/3 54/10
discovery [10] 28/7 28/19 28/20 32/20
 32/21 32/22 35/24 57/14 57/21 59/5
discretion [3] 35/1 35/1 35/9
discussed [1] 39/6
discussions [3] 48/23 48/24 64/8
dispute [8] 10/15 10/24 11/2 11/6 47/12
 50/16 50/17 55/22
disputed [2] 4/3 49/19
distributed [1] 47/14
distributing [1] 37/12
distribution [1] 37/14
district [6] 1/1 1/2 1/20 47/10 58/8 60/19
divide [1] 62/16
DIVISION [1] 1/3
do [50]
document [5] 9/6 28/22 29/1 29/8 62/4
documents [4] 10/3 29/13 29/15 40/2
does [9] 10/14 14/17 25/23 29/8 55/6
 55/9 55/25 56/20 64/18
doesn't [13] 8/9 14/13 15/6 20/2 20/3
 25/21 30/14 33/15 41/11 46/2 46/23
 46/24 47/6
doing [11] 19/6 22/20 23/5 23/10 24/19
 25/10 26/1 26/10 38/3 39/17 49/22
don't [41]
donate [2] 60/14 60/20
done [5] 24/2 24/8 39/9 47/24 62/15
double [5] 7/16 8/25 29/16 31/9 31/12
double-check [3] 29/16 31/9 31/12
double-sided [2] 7/16 8/25
doubt [3] 35/8 54/23 54/24
down [3] 6/9 6/18 41/2
due [1] 57/21
during [4] 8/4 42/21 46/3 52/16
duty [2] 20/8 20/9

## E

e-mail [8] 5/16 5/17 5/22 6/1 19/7 27/2
 36/21 37/16
e-mails [11] 5/6 5/8 5/9 5/13 10/20 10/24
 11/10 19/22 20/4 25/11 37/17
each [7] 9/22 9/24 13/9 25/24 53/20
 60/12 64/23
earliest [2] 18/4 43/8
early [6] 13/20 15/12 15/16 18/11 19/25
 25/3
easily [2] 21/17 55/7
easy [1] 44/1
effort [1] 44/22
efforts [1] 61/12
eight [2] 61/17 64/25
either [2] 57/10 60/15
elective [1] 63/14
electronic [9] 15/10 15/10 15/14 15/19
 15/20 16/1 16/4 16/10 38/22
electronically [4] 8/17 8/18 16/11 39/17
element [2] 32/13 34/3
eliminated [1] 14/20
eliminates [1] 5/3
else [10] 16/3 23/8 51/17 51/25 54/22
 55/6 57/3 59/18 64/15 65/15
employee [7] 11/11 11/11 36/7 36/9 37/6
 37/9 37/19
employees [20]
employees' [2] 7/8 52/12
end [2] 19/9 23/22
ENERGY [6] 1/6 3/4 3/16 3/17 3/20 3/21
Energy Intelligence [3] 3/4 3/17 3/21
enough [1] 48/2
enterprise [4] 53/8 53/8 53/15 53/19
entire [1] 16/25
entitled [6] 25/18 25/20 33/24 34/14
 34/14 66/8
entity [2] 25/24 27/7
equally [1] 62/17
equivalent [1] 39/11
ESI [1] 57/6
ESQ [4] 2/4 2/9 2/10 2/15
established [1] 34/13
et [2] 1/6 1/10
evaluating [1] 34/2
even [9] 14/6 23/7 23/17 23/18 28/11
 33/10 35/2 54/9 62/24
ever [4] 14/10 23/7 24/10 40/23
every [14]
everybody [9] 16/24 17/1 20/24 20/25
 22/6 23/8 39/14 55/6 65/16
everything [2] 27/25 30/17
evidence [18]
evidentiary [1] 4/24
evolution [1] 15/4
ex [1] 11/11
ex-employee [1] 11/11
exactly [2] 32/17 37/13
examination [1] 62/20
example [1] 65/1
except [2] 55/23 62/2
excess [1] 63/18
Excuse [3] 8/22 17/20 56/3
exercise [2] 64/24 65/1
exhibit [7] 5/10 5/11 5/13 6/8 51/9 55/16
 56/4
Exhibit 3 [1] 5/13
exhibits [7] 4/7 4/10 5/4 5/5 6/10 6/4
 56/10
exist [2] 4/16 30/14
existence [1] 4/17
expanded [1] 63/2
expect [1] 49/7

expended [1] 42/22
experienced [1] 60/2
expert [2] 10/5 58/7
explained [1] 46/14
explaining [1] 58/2
explore [1] 18/23
extent [2] 32/3 52/13
Exxon [2] 26/11 26/13

## F

face [2] 7/12 7/15
facie [1] 4/17
fact [14]
factor [2] 32/14 34/1
facts [2] 22/2 44/19
factual [1] 19/5
failed [1] 7/23
familiar [1] 39/1
far [5] 19/16 32/5 34/9 64/12 64/14
fee [1] 63/17
felt [1] 40/17
few [2] 37/23 38/11
figure [1] 51/5
file [4] 49/24 50/3 50/4 50/12
filed [8] 17/23 28/5 30/1 31/25 38/6 43/4
 44/19 52/5
filing [2] 21/5 23/11
filings [1] 32/22
fill [1] 65/12
finalize [1] 60/23
finances [1] 34/6
financial [10] 12/1 32/9 32/15 32/19 33/2
 33/15 33/24 34/6 34/15 52/14
find [4] 21/24 35/24 35/25 57/6
finding [1] 41/3
finds [2] 34/2 34/12
fine [11] 8/12 15/22 22/18 34/11 38/2
 42/19 43/13 46/22 58/21 61/1 61/7
finish [1] 62/24
first [13] 7/19 11/8 16/19 17/24 19/7
 33/11 40/15 41/8 44/16 64/25 65/11
 65/11 65/13
five [5] 60/16 60/22 61/15 61/16 61/16
five-mile [2] 60/16 60/22
FLOOR [2] 2/5 2/16
focused [1] 47/14
follow [3] 49/6 49/13 60/3
foregoing [1] 66/6
forever [1] 31/23
form [5] 49/12 50/14 50/18 51/7 55/17
format [1] 66/9
former [1] 63/1
forms [1] 12/7
forward [5] 5/21 8/9 18/18 26/23 48/6
forwarded [2] 10/25 11/10
forwarding [12] 5/24 6/2 6/4 10/18 16/11
 19/19 19/22 20/4 36/22 40/10 40/18 41/3
found [6] 30/10 35/2 40/17 43/8 43/10
 43/13
four [3] 28/15 61/16 61/16
fraud [7] 38/17 38/19 51/18 51/19 54/19
 54/20 54/21
Friday [3] 1/16 3/1 62/15
friend [1] 39/9
front [1] 8/24
further [4] 6/7 14/20 15/2 49/23

## G

gave [3] 8/23 42/13 56/23
generate [2] 54/11 54/16
generated [3] 13/13 54/1 54/2
George [2] 11/25 30/24
get [27]
gets [1] 37/1

## G

getting [5]  13/8 15/13 15/21 36/16 55/23
GIBSON [2]  2/3 2/15
give [5]  29/19 53/20 54/24 55/11 56/25
given [3]  36/4 42/8 42/24
giving [2]  39/9 54/5
glad [1]  59/22
global [8]  53/7 53/8 53/15 53/19 63/13
 63/18 63/21 63/23
go [20]
goes [9]  13/5 13/14 13/15 33/21 35/19
 35/21 51/18 54/18 58/25
going [58]
gone [2]  40/19 64/20
good [11]  3/7 3/10 3/14 3/18 3/22 6/16
 31/19 41/11 50/6 52/7 59/15
got [12]  6/17 9/1 11/5 22/24 29/4 30/10
 32/22 43/1 46/12 58/21 59/21 60/1
GROUP [6]  1/6 3/4 3/16 3/17 3/20 3/21
Gudino [1]  5/18
guess [4]  4/5 25/5 25/14 59/23
guy [1]  21/3
guys [5]  6/18 24/3 29/12 49/9 58/20

## H

had [55]
hand [2]  22/3 23/10
handful [1]  19/10
handling [1]  5/24
happen [1]  8/14
happened [2]  46/3 53/16
happening [3]  17/8 20/22 26/15
happens [1]  53/11
happy [1]  44/23
hard [7]  15/8 15/9 15/22 15/23 26/17 41/3
 41/10
has [13]  9/23 22/10 24/3 24/6 35/1 35/1
 35/5 35/9 36/21 43/2 46/6 53/12 53/14
hasn't [1]  57/20
have [122]
haven't [3]  32/24 57/18 59/15
having [3]  39/9 48/2 52/2
he [33]
he'd [1]  53/17
he's [3]  10/19 42/17 55/23
hear [2]  49/7 49/10
heard [2]  49/7 59/16
hearing [2]  35/25 41/25
held [2]  34/20 66/8
help [1]  42/18
helping [1]  13/9
her [3]  14/25 14/25 15/1
here [15]
hereby [1]  66/5
hey [2]  14/15 26/19
hid [1]  30/19
high [3]  53/16 53/17 53/19
highly [3]  33/9 34/20 35/5
him [7]  10/21 42/14 45/24 46/14 49/7
 49/7 49/10
his [13]  10/11 11/13 11/19 30/25 31/1
 42/17 42/18 45/25 46/5 46/13 55/25
 56/10 56/10
Historically [1]  29/2
history [1]  41/8
Hitchcock [3]  53/1 53/2 53/3
hold [4]  57/9 58/6 58/10 58/16
HON [1]  1/4
Honor [105]
hope [1]  49/10
hours [2]  49/17 49/18
Houston [3]  10/12 50/7 58/13
how [30]

## I

however [1]  62/17
HUDSON [2]  2/4 2/16
hun [12]  7/18 12/24 26/2 37/8 39/15
 42/16 47/21 62/6 63/19 63/25 64/3 64/15

I'd [2]  9/23 50/17
I'm [26]
I've [2]  51/2 60/1
idea [3]  31/19 46/22 55/10
identified [1]  36/5
identifies [1]  36/7
impermissible [1]  26/1
implemented [1]  53/7
imply [1]  24/24
important [2]  17/9 41/12
improper [1]  25/11
inadvertently [1]  45/2
INC [4]  1/6 3/4 3/17 3/20
inception [1]  13/17
inclined [1]  62/14
include [1]  56/24
included [1]  20/15
includes [1]  62/19
including [2]  53/10 58/17
inconvenience [2]  59/24 59/25
increasing [1]  40/25
indicated [1]  56/17
indication [2]  24/22 42/5
indications [1]  24/21
individual [2]  41/17 47/8
individuals [13]  8/13 10/19 14/21 23/16
 23/19 23/24 25/9 32/10 44/25 46/6 46/9
 46/12 46/14
industry [1]  40/25
inflammatory [2]  33/9 35/6
information [14]
informed [2]  27/10 49/4
infringement [9]  16/9 19/18 20/12 35/4
 36/8 37/25 42/5 47/13 51/16
infringements [4]  13/6 17/6 17/6 19/25
infringing [1]  23/2
input [1]  40/12
inquire [1]  24/1
inquiry [4]  20/21 20/23 20/24 22/13
insert [1]  8/11
inserted [1]  14/22
instance [1]  47/7
instances [4]  13/18 24/12 63/5 63/16
instead [3]  18/7 21/17 21/20
instructed [1]  34/23
instructions [4]  3/24 4/2 4/3 51/1
integrity [1]  53/25
intellectual [1]  22/24
INTELLIGENCE [6]  1/6 3/4 3/16 3/17
 3/20 3/21
intentionally [1]  24/19
internal [2]  19/9 37/14
interpretation [2]  8/21 24/24
invalid [1]  6/22
invoice [11]  7/17 8/12 14/8 14/20 15/3
 16/20 18/7 21/18 21/21 22/24 23/13
invoices [3]  15/4 51/21 51/22
involved [4]  10/17 43/17 44/11 45/12
involving [1]  44/25
is [130]
isn't [8]  4/21 24/12 24/21 25/15 25/18
 28/10 32/12 34/23
issue [24]
issues [3]  33/13 44/17 49/17
it [175]
it's [47]
itself [2]  7/6 9/18

## J

January [11]  51/6 59/18 60/24 60/25 61/1
 61/2 61/2 61/3 61/4 61/10 65/16
January 28th [1]  61/2
January 3rd [4]  61/2 61/4 61/10 65/16
January 4th [5]  51/6 55/18 60/25 61/1
 61/3
Jay [3]  17/12 17/14 20/9
Jay-Z [3]  17/12 17/14 20/9
John [1]  53/3
joint [5]  44/22 51/1 52/3 55/15 55/16
Jones [2]  5/17 5/24
Joyce [1]  47/7
JR [1]  2/9
JUDGE [5]  1/4 17/15 57/25 58/3 58/23
Judge Segal [1]  58/23
judgment [1]  44/13
Judicial [1]  66/10
July [8]  4/14 17/23 17/23 17/25 18/4 18/5
 18/20 57/25
July 6 [5]  4/14 17/25 18/4 18/5 18/20
July 6th [1]  17/23
jumping [2]  54/4 54/8
June [2]  4/13 14/5
June 6 [2]  4/13 14/5
Juror [5]  65/2 65/2 65/2 65/10 65/12
jury [22]
just [31]
justice [1]  60/5

## K

key [1]  14/21
kind [5]  20/10 44/11 44/21 46/20 54/24
kindly [1]  49/16
King [4]  11/25 13/2 45/2 45/17
King's [1]  30/24
knew [12]  16/12 17/5 18/5 18/25 19/22
 20/3 23/4 25/10 25/25 26/10 35/17 46/11
know [25]
knowing [1]  22/18
knowledge [8]  13/6 16/9 16/11 19/6 19/8
 20/17 26/14 39/3
known [2]  48/13 48/14

## L

language [2]  40/8 56/5
large [2]  26/11 26/13
last [5]  23/1 41/24 49/3 57/5 57/11
lasted [1]  15/18
later [1]  37/24
latter [1]  6/4
law [1]  33/3
lawsuit [11]  17/23 17/24 30/1 40/15 42/22
 43/8 44/19 53/18 53/25 54/16 58/10
lawsuits [57]
lawyers [6]  28/16 40/11 43/17 59/24 60/1
 60/9
lead [2]  41/11 50/4
leading [1]  40/24
learn [2]  19/18 36/20
learned [4]  19/7 19/17 28/1 36/12
least [2]  21/24 47/22
leave [2]  9/22 55/21
leaves [1]  8/20
left [1]  10/19
legal [3]  8/20 35/13 41/7
let [6]  7/10 10/23 17/1 18/6 33/10 38/7
Let's [6]  3/22 9/2 51/6 51/9 55/15 55/16
letter [2]  16/20 24/5
letting [1]  60/18
level [3]  53/16 53/17 53/19
liability [3]  33/4 33/11 35/4
librarian [2]  44/24 46/19

## L

license [19]
licenses [3] 41/19 53/8 53/9
lied [1] 46/11
like [19]
limine [10] 12/8 12/9 31/16 31/20 31/22
  31/25 32/7 51/10 56/5 56/18
limit [1] 31/16
limitations [14]
limited [3] 3/17 3/21 8/13
lined [1] 60/7
link [2] 21/9 21/9
list [32]
lists [2] 47/25 62/13
litigated [1] 57/25
litigation [7] 23/3 39/2 57/9 58/6 58/10
  58/16 59/6
litigations [4] 30/16 42/15 42/18 63/12
live [1] 52/25
lives [1] 10/12
LLP [1] 2/9
loads [1] 41/2
local [1] 60/21
location [1] 41/19
lodged [2] 5/7 6/11
look [19]
looked [6] 7/20 7/22 9/9 38/25 39/21 46/4
  65/18
looking [6] 44/20 45/15 45/18 45/21
  45/24 60/10
looks [4] 51/1 52/7 56/9 62/2
Los [4] 1/15 1/21 2/11 3/1
lose [3] 57/13 65/3 65/3
loses [1] 37/25
lot [2] 11/5 60/7
Louis [1] 35/17
LP [6] 1/9 3/5 3/9 3/9 3/12 3/13
lured [1] 14/25

## M

made [12] 29/13 29/14 29/17 29/24 30/5
  31/7 31/15 48/19 58/5 58/10 64/11 64/13
magazine [1] 63/9
mail [9] 5/16 5/17 5/22 6/1 15/23 19/7
  27/2 36/21 37/16
mails [11] 5/6 5/8 5/9 5/13 10/20 10/24
  11/10 19/22 20/4 25/11 37/17
make [14]
making [11] 4/6 22/18 27/6 36/6 36/21
  37/11 38/9 38/21 39/10 39/13 47/11
managing [2] 53/3 54/10
many [18]
marked [5] 27/16 27/19 27/20 27/25 28/8
marketing [4] 3/9 3/13 53/4 54/10
matches [1] 54/15
matter [1] 66/8
matters [2] 26/16 57/8
may [12] 4/22 11/19 23/21 25/2 25/6
  25/14 25/24 34/25 38/2 40/18 47/4 64/19
maybe [4] 36/15 41/18 42/6 62/24
me [26]
mean [5] 18/12 25/24 27/20 28/3 45/13
meaning [1] 45/14
means [1] 20/18
measure [1] 47/15
mediation [3] 48/22 49/4 61/12
mediator [3] 48/25 49/2 49/3
meet [4] 6/7 49/23 49/24 53/17
meetings [1] 49/1
memory [2] 15/15 42/18
mentioned [1] 41/25
merely [2] 9/17 48/1
mesereau [4] 2/9 2/9 2/13 3/11
mesereauyu.com [2] 2/12 2/13

met [2] 4/1 49/11 49/15
Microsoft [3] 20/25 21/22 35/4
might [3] 19/10 19/10 41/3
mile [2] 60/16 60/22
million [1] 63/24
mind [1] 43/24
minds [1] 48/19
minimum [1] 25/22
minute [1] 55/19
minutes [1] 55/21
mistakenly [1] 19/11
misunderstanding [1] 16/18
Monday [3] 29/20 49/4 50/11
money [1] 54/11
MONICA [1] 2/10
monies [1] 54/16
more [12] 9/17 25/15 25/19 32/3 32/6
  41/6 44/22 47/14 47/23 48/3 56/22 58/14
most [1] 49/17
motion [11] 12/8 12/9 12/12 12/13 12/14
  31/15 31/16 44/13 56/4 56/18 65/5
motions [5] 31/20 31/22 31/25 32/7 51/10
Mr. [6] 13/2 30/24 45/2 45/17 53/1 53/2
Mr. George [1] 30/24
Mr. Hitchcock [2] 53/1 53/2
Mr. King [3] 13/2 45/2 45/17
much [6] 31/21 35/8 54/11 63/25 65/16
  65/18
my [6] 8/22 39/3 39/9 40/1 45/3 59/22
myself [2] 50/24 64/20

## N

nature [2] 25/11 38/18
near [2] 19/9 19/10
necessary [2] 44/23 62/13
need [15]
needed [1] 59/22
needs [3] 15/23 30/12 59/13
neither [1] 10/5
never [16]
new [5] 2/5 2/17 8/23 20/18 55/16
newsletter [2] 21/13 37/2
newsletters [2] 7/14 38/21
newspaper [1] 53/13
next [6] 10/11 32/4 49/24 49/24 57/16
  58/20
nine [1] 61/17
Ninth [4] 17/13 17/15 17/16 35/2
Ninth Circuit [1] 35/2
no [68]
nobody [3] 7/20 7/22 9/9
none [2] 25/12 40/22
North [1] 1/21
not [54]
nothing [2] 8/10 65/15
notice [22]
notices [2] 19/14 48/6
notifying [2] 38/7 38/9
now [20]
number [13] 5/6 5/12 11/3 11/4 13/7
  13/18 40/25 41/1 41/22 42/2 44/13 44/24
  65/10
numbers [1] 43/1
NY [2] 2/5 2/17

## O

objecting [1] 56/6
objection [2] 4/11 6/5
objections [10] 4/24 4/24 5/7 6/11 6/12
  6/14 12/5 12/10 12/19 28/24
objective [1] 54/22
obtained [1] 13/11
obviously [2] 6/6 38/1
occurred [2] 39/2 56/3

October [3] 14/19 19/7 36/12
off [4] 5/13 16/5 18/13 18/21
offer [5] 11/19 53/19 56/21 58/5 58/11
offered [4] 4/16 12/25 49/16 57/10
offering [11] 4/7 5/15 5/19 10/9 10/10
  11/16 11/20 11/21 51/12 52/24 57/1
office [1] 49/16
officer [1] 12/1
officers [1] 54/9
Official [1] 1/20
oh [4] 39/5 45/3 56/9 59/20
Oil [8] 14/4 19/25 21/7 24/4 53/10 53/10
  53/13 64/1
okay [92]
omitted [1] 19/11
once [7] 15/25 34/13 34/18 34/22 53/9
  53/12 53/14
one [54]
one-person [2] 16/22 23/7
ongoing [2] 48/23 64/8
only [17]
oOo [2] 3/2 66/1
opening [2] 52/8 62/19
operates [1] 34/18
operation [1] 14/15
opportunity [12] 13/16 13/19 17/1 17/7
  17/12 17/19 18/22 18/23 19/18 24/1
  35/18 51/15
opposed [1] 51/24
order [10] 9/20 28/12 29/2 44/15 48/19
  55/19 58/15 58/21 60/11 60/12
orderly [2] 60/4 60/6
orders [4] 58/16 60/3 60/4 60/14
ordinary [1] 39/8
organization [3] 5/21 32/15 34/9
original [1] 64/2
OSC [3] 59/19 59/20 59/21
other [77]
others [3] 11/10 26/11 26/14
ought [1] 33/7
our [26]
out [34]
over [9] 11/5 15/25 16/10 29/22 30/6
  30/12 59/8 62/12 64/20
overbroad [2] 31/10 31/11
oversees [1] 13/2
owe [1] 55/14
own [2] 15/21 19/2
owner [1] 16/19
owns [1] 27/7

## P

p.m [3] 1/16 3/1 65/21
PA [2] 1/8 3/3
PACER [3] 43/7 43/22 44/1
page [2] 7/19 66/9
paid [2] 63/7 63/17
paper [11] 8/3 8/5 8/17 15/18 15/20 16/3
  16/10 18/3 19/25 20/17 39/7
papers [2] 14/6 21/7
part [7] 12/7 30/18 40/8 40/9 53/18 63/4
  63/8
particular [1] 18/19
parties [7] 4/1 4/3 27/22 43/2 48/25 61/18
  63/16
party [2] 10/12 58/8
pass [1] 65/3
passing [1] 39/13
path [1] 57/6
pay [4] 60/13 60/14 60/20 63/7
payable [1] 60/19
payment [1] 36/8
pending [2] 44/13 47/9
Pennsylvania [2] 44/11 47/10

## P

people [41]
per [4] 33/22 63/22 64/4 64/5
PERCY [1] 1/4
peremptories [2] 64/24 65/1
peremptory [3] 64/23 65/4 65/6
perfectly [1] 15/22
period [4] 6/4 8/4 10/17 19/1
periods [1] 57/17
permission [1] 48/4
permitted [3] 6/22 7/13 9/16
person [21]
pertaining [1] 29/15
Phone [1] 1/22
photocopier [1] 39/13
pick [2] 9/21 55/20
pieces [1] 21/15
PIPELINE [4] 1/9 3/5 3/9 3/12
place [3] 5/20 29/2 65/3
PLAINS [6] 1/9 3/4 3/9 3/9 3/12 3/13
plaintiff's [3] 11/25 13/12 14/25
plaintiffs [10] 1/7 2/2 3/16 3/19 10/8 13/16 26/5 27/22 44/25 53/4
plaintiffs/counter-defendants [1] 3/16
plan [1] 49/22
play [1] 16/12
pleadings [1] 47/11
please [5] 3/6 14/9 14/9 21/23 44/2
plenty [1] 18/22
plural [1] 23/16
point [9] 4/2 15/8 19/5 41/23 42/3 47/23 48/20 52/16 62/14
Polar [4] 17/12 17/15 17/17 20/9
policy [3] 37/24 40/16 41/7
position [4] 9/9 9/15 41/9 61/11
possible [1] 15/24
possibly [1] 57/10
POWLEY [4] 2/3 2/4 2/15 3/15
powleygibson.com [2] 2/6 2/18
pre [1] 57/6
pre-2009 [1] 57/6
precisely [2] 16/13 21/6
prejudice [1] 33/9
prejudicial [2] 34/20 35/6
preparation [1] 45/3
prepare [3] 31/1 45/3 46/4
prepared [3] 42/18 46/5 46/13
presentation [1] 60/6
preserved [1] 57/13
PRESIDING [1] 1/4
pretrial [4] 1/17 51/8 55/16 60/24
pretty [3] 31/21 39/1 62/25
previous [1] 12/15
previously [1] 41/9
price [1] 36/16
priced [1] 63/22
prima [1] 4/17
print [1] 8/12
prior [9] 4/13 17/22 18/5 18/21 18/25 19/7 39/12 40/17 47/8
privilege [1] 54/7
probably [5] 6/8 9/21 25/3 41/18 47/18
problem [5] 18/14 23/23 24/9 28/9 28/10
problems [1] 25/4
procedures [1] 30/22
proceedings [3] 1/14 65/21 66/8
produce [1] 30/22
produced [4] 28/12 29/1 29/3 30/17
proffer [2] 9/24 12/20
proffers [4] 50/19 50/20 51/6 55/17
profitability [1] 13/3
program [3] 23/1 23/3 63/2
programs [1] 22/23

progress [3] 4/6 64/11 64/13
prohibited [1] 27/6
promoting [1] 10/18
prompting [1] 59/22
proper [1] 32/16
properly [1] 57/13
property [1] 22/24
protect [4] 14/1 22/24 55/2 55/4
protected [2] 27/10 57/8
protecting [1] 19/24
protective [5] 28/12 29/2 44/15 58/15 58/21
proves [2] 54/18 54/20
provide [2] 57/12 58/19
provided [8] 7/19 29/7 29/18 32/24 42/20 58/1 59/5 63/15
providing [1] 36/19
public [4] 30/2 47/11 60/15 60/21
publication [7] 5/21 19/20 26/22 26/23 36/24 53/22 57/18
publications [14]
publicly [1] 41/4
publisher [1] 19/13
punitive [2] 32/13 34/19
purchased [1] 48/14
purpose [1] 17/13
purposes [2] 13/7 17/22
pursuant [1] 66/5
pursue [2] 13/16 51/15
put [8] 14/5 17/3 20/24 21/14 27/9 38/7 64/18 64/22
puts [2] 21/23 22/20
putting [2] 12/9 33/14

## Q

question [5] 8/22 10/23 35/11 35/18 35/20
questions [1] 65/7
quicker [1] 62/24
quite [1] 44/1

## R

radius [2] 60/16 60/22
raised [1] 42/10
range [2] 33/16 33/19
rather [3] 47/11 60/3 63/7
rationale [1] 38/2
reached [1] 36/14
read [5] 15/6 23/17 23/18 23/18 47/10
reading [1] 39/10
ready [1] 60/8
real [2] 52/19 59/15
realized [1] 23/23
really [13] 4/19 10/24 11/6 13/23 18/15 40/19 41/12 42/23 47/18 47/24 57/5 57/20 60/7
reason [6] 9/9 13/25 16/14 21/6 39/23 59/15
reasonable [6] 17/19 20/21 20/23 20/24 21/12 22/13
recalled [1] 57/17
receive [3] 9/5 36/13 37/19
received [7] 8/24 10/20 11/10 30/22 37/20 38/8 57/18
receiving [3] 8/4 9/13 37/22
recent [1] 52/5
recently [1] 64/5
recipient [1] 47/7
recipients [1] 37/18
record [4] 25/12 30/2 40/2 47/11
records [1] 39/25
referred [1] 47/9
refers [1] 36/25
regarding [8] 11/2 12/14 19/6 32/9 32/18

34/2 40/9 52/22
registered [1] 14/6
registration [1] 4/18
registrations [5] 4/9 4/10 4/12 4/16 4/25
regulations [1] 66/10
relationship [2] 38/1 41/11
relevance [1] 13/14
relevant [16]
relief [2] 6/21 6/25
rely [1] 10/4
remained [2] 39/24 40/6
remaining [2] 6/10 51/10
remind [1] 21/25
removes [1] 5/5
renew [5] 14/9 14/9 14/14 16/20 21/18
repeat [1] 64/20
report [2] 37/25 61/11
reported [1] 66/7
Reporter [2] 1/20 66/16
REPORTER'S [1] 1/14
reporters [2] 41/1 41/14
reports [1] 36/8
request [12] 29/9 29/13 29/14 29/18 30/6 30/19 31/7 31/10 31/11 42/21 43/5 59/5
requested [3] 29/19 32/25 57/6
requests [2] 29/1 35/24
required [2] 27/7 27/9
resolve [4] 44/16 50/15 52/20 64/18
resolved [2] 26/16 57/25
resources [1] 32/9
response [4] 28/23 56/4 57/21 57/22
restriction [3] 15/5 21/20 23/13
restrictions [4] 7/25 8/7 8/8 22/5
result [1] 38/6
results [1] 59/21
revenue [2] 32/19 32/23
revenues [5] 13/13 54/1 54/1 54/2 54/15
review [2] 39/3 40/1
right [27]
rights [1] 22/24
risk [1] 58/18
rlpowley [1] 2/6
ROBERT [2] 2/4 3/15
Robert Powley [1] 3/15
room [1] 8/20
route [1] 15/23
routing [1] 39/7
row [2] 65/11 65/13
ruled [1] 58/4
run [3] 4/23 22/10 58/18
running [1] 49/9
runway [1] 49/10

## S

said [29]
salaries [2] 52/10 52/12
salary [1] 31/13
sales [6] 36/14 36/15 36/23 37/25 53/4 54/10
salesperson [2] 36/18 37/1
same [16]
sampling [2] 57/10 57/15
sanctioned [1] 60/12
SANTA [1] 2/10
save [1] 48/16
say [26]
saying [22]
says [10] 20/16 20/20 21/3 23/15 37/6 45/20 45/21 46/1 48/6 48/7
scale [2] 26/11 26/13
schedule [1] 50/10
scheduled [1] 49/2
scheme [1] 13/14
school [2] 60/15 60/21

**S**

seaf [2] 65/11 65/15
seated [1] 65/11
SEC [1] 32/22
second [3] 17/24 17/24 65/13
secretaries [1] 46/18
Section [1] 66/5
secure [2] 19/7 36/20
see [10] 3/22 6/11 11/12 20/21 23/2 36/13 47/22 51/9 56/14 65/16
seek [1] 31/17
seeking [7] 6/21 11/12 12/20 19/15 19/19 34/3 52/9
seems [1] 62/24
Segal [3] 57/25 58/3 58/23
selection [1] 64/20
send [6] 9/20 16/19 32/20 37/13 37/16 48/18
sending [5] 8/16 14/8 15/1 24/5 27/3
sends [1] 37/9
senior [1] 47/8
sent [10] 9/4 11/7 11/8 26/4 26/5 26/21 32/21 35/24 36/24 37/14
separate [1] 18/3
separated [1] 35/5
September [1] 31/1
September 11th [1] 31/1
series [2] 7/7 7/16
seriously [1] 41/6
service [1] 36/15
set [3] 14/23 31/5 44/18
sets [1] 60/1
settle [3] 53/9 53/15 54/5
settled [4] 27/24 28/8 63/2 63/3
settlement [6] 29/20 48/21 63/8 63/15 63/17 64/8
settlements [1] 63/4
settling [1] 53/20
seven [2] 61/17 65/12
several [3] 13/18 63/5 63/16
share [2] 44/14 44/22
she [3] 17/16 36/25 46/13
she's [2] 6/1 6/3
should [4] 6/14 34/4 60/17 65/4
shouldn't [2] 18/16 33/1
show [3] 5/19 5/20 51/13
showing [1] 36/25
shows [1] 37/10
side [6] 9/1 9/22 10/5 60/13 64/23 65/5
sidebar [1] 65/6
sided [2] 7/16 8/25
sides [3] 50/20 58/25 62/12
signed [1] 63/1
similar [4] 29/24 31/3 44/19 44/21
simple [2] 9/1 60/7
simply [2] 7/23 60/2
simultaneously [1] 39/13
since [3] 10/19 17/23 49/7
single [1] 38/15
sit [4] 6/9 6/18 17/18 30/9
site [1] 41/18
situation [2] 39/11 63/23
situations [1] 40/21
six [2] 19/13 61/17
size [1] 63/22
slip [1] 39/7
smankrom [1] 2/18
Snyder [1] 17/15
so [82]
so-called [1] 13/6
software [4] 20/17 21/4 21/23 21/23
solely [1] 41/14
solicited [1] 46/19

some [16]
somebody [3] 20/18 29/8 55/25
somebody's [1] 22/19
somehow [1] 22/9
someone [2] 40/18 41/7
someone's [1] 36/20
something [2] 9/17 47/4
sometime [1] 14/19
Sonya [2] 5/17 5/24
Sonya Jones [1] 5/24
soon [1] 49/10
sophistication [1] 34/9
sorry [18]
sort [4] 25/5 33/15 36/4 52/20
sounds [1] 47/23
speak [1] 10/21
speaking [1] 42/4
special [1] 50/14
specific [2] 10/2 40/18
speculation [1] 30/18
spin [2] 45/9 46/25
spoke [1] 49/3
Spring [1] 1/21
staff [1] 37/25
stand [1] 30/15
standard [1] 35/17
start [6] 5/12 5/13 15/13 21/16 27/3 36/16
started [10] 13/19 14/7 16/5 16/13 16/16 19/19 39/17 41/7 42/4 44/18
Starting [1] 19/12
state [2] 3/6 57/16
statement [3] 52/3 52/8 55/15
statements [1] 62/19
STATES [4] 1/1 44/12 66/6 66/10
status [6] 3/24 32/9 32/15 33/2 34/15 61/11
statute [16]
statute's [1] 4/23
statutory [4] 32/12 33/4 33/20 34/2
stay [1] 53/20
Steel [1] 44/12
stenographically [1] 66/7
STEPHEN [1] 2/15
Steven [1] 3/19
Steven Ankrom [1] 3/19
still [10] 8/8 8/16 10/16 23/18 24/9 48/24 49/18 57/19 64/11 64/13
stipulation [4] 6/8 51/9 55/16 62/4
storage [1] 58/13
store [1] 39/9
straightforward [1] 62/25
strange [1] 43/23
streamline [1] 35/6
Street [3] 1/21 2/4 2/16
strong [1] 47/1
stuff [1] 30/6
subject [3] 12/11 58/8 58/15
submit [2] 49/19 60/17
submitted [2] 49/19 51/1
subscribed [3] 14/4 41/19 63/12
subscriber [1] 14/15
subscribers [3] 41/16 41/17 41/22
subscribing [2] 53/13 54/7
subscription [32]
subscriptions [4] 25/4 41/15 46/6 46/20
subsequent [2] 4/19 11/9
such [3] 20/22 21/15 26/13
sue [12] 13/9 17/7 18/21 18/22 20/7 20/19 20/25 23/12 24/12 41/10 53/12 53/14
sued [11] 14/18 17/1 23/23 24/21 25/15 25/25 40/23 41/9 41/25 46/8 46/20
suffering [1] 27/13
suggested [2] 57/11 57/14

suing [15]
SUITE [1] 2/11
suits [1] 42/6
sum [1] 46/14
summarize [1] 56/20
summary [1] 44/13
support [3] 10/1 10/4 44/23
supposed [2] 34/23 59/23
sure [10] 13/22 23/6 24/18 35/9 41/5 51/4 58/16 59/4 59/5 62/13
survive [1] 41/13
SUSAN [3] 2/10 3/7 50/6
Susan Yu [1] 3/7
switched [3] 15/20 15/25 16/10
system [2] 19/7 36/21

**T**

take [16]
taken [3] 10/11 11/14 30/25
taking [3] 32/4 39/6 41/7
talk [3] 26/8 26/18 42/14
talked [1] 57/5
tampering [2] 18/7 18/9
tapes [6] 57/8 57/11 58/2 58/6 58/19 59/14
target [2] 13/9 30/23 45/1
targeted [7] 31/2 45/11 45/13 45/14 46/23 54/15 56/11
targeting [4] 31/4 44/18 45/1 45/7
team [2] 36/15 36/15
tell [7] 26/22 36/19 36/23 43/3 62/15 62/21 62/23
telling [4] 14/10 14/11 18/8 64/7
ten [4] 22/23 23/5 61/17 61/17
ten-year [1] 22/23
terms [5] 16/8 18/10 23/24 28/6 51/23
testified [6] 13/2 19/23 45/17 53/1 53/6 54/9
testimonial [1] 19/5
testimony [25]
than [16]
thank [8] 3/17 33/23 59/17 64/16 65/15 65/18 65/19 65/20
that [357]
that's [52]
their [82]
them [44]
then [26]
there [81]
there's [7] 38/16 39/4 50/2 63/5 63/5 63/16 63/17
these [35]
they [278]
they'd [3] 7/23 9/13 44/22
They're [1] 7/7
they've [11] 19/13 27/15 29/4 29/6 40/18 41/25 42/9 42/10 47/12 54/9 63/12
thing [13] 16/19 24/2 25/23 36/20 39/10 41/3 41/10 43/22 46/21 48/1 50/24 57/4 57/20
things [2] 18/6 40/4
think [53]
thinking [1] 25/5
third [2] 10/12 46/12
this [74]
THOMAS [2] 2/9 3/11
Thomas Mesereau [1] 3/11
those [33]
though [2] 14/6 49/8
thought [6] 15/11 15/16 15/19 24/25 43/22 44/20
three [10] 18/2 18/4 18/20 53/22 61/16 61/16 62/9 63/21 63/23 64/23
three-year [2] 63/21 63/23

**T**

through [15]
Thursday [1]  49/6
time [19]
times [3]  38/12 39/4 63/4
timing [1]  21/15
Title [1]  66/6
today [13]  9/21 9/22 14/9 14/9 16/20 36/2
  36/3 49/23 55/20 57/3 57/21 60/18 64/16
together [5]  6/15 21/15 49/15 49/20 62/21
told [2]  16/1 64/19
too [3]  25/9 38/14 63/13
took [3]  41/5 45/25 47/13
top [1]  19/10
total [3]  42/2 46/14 63/19
toys [3]  60/15 60/20 60/21
traditionally [1]  29/18
transcript [4]  1/14 56/5 66/7 66/9
transition [1]  39/2
transitioning [1]  5/25
trap [1]  25/13
trapped [2]  25/5 25/8
travel [1]  49/5
traveling [1]  50/7
trial [7]  4/7 10/13 31/18 44/23 52/17 60/6
  60/8
tried [3]  40/3 48/20 49/13
trier [1]  7/2
true [2]  34/24 66/6
truth [1]  60/5
try [3]  9/2 38/7 40/9
trying [7]  22/9 22/12 36/13 48/21 50/15
  55/1 55/4
Tuesday [1]  49/15
turn [3]  29/22 30/6 59/8
turned [2]  30/12 42/5
turning [1]  38/6
two [11]  4/3 6/13 13/8 14/20 32/3 42/3
  60/1 61/15 61/16 62/8 62/11
type [3]  28/20 39/10 42/1
typically [1]  63/12

**U**

U.S [2]  1/20 66/16
Uh [12]  7/18 12/24 26/2 37/8 39/15 42/16
  47/21 62/6 63/19 63/25 64/3 64/15
Uh-huh [12]  7/18 12/24 26/2 37/8 39/15
  42/16 47/21 62/6 63/19 63/25 64/3 64/15
UK [2]  3/17 3/21
ultimately [1]  53/18
under [5]  17/12 17/16 20/8 27/8 28/12
understand [5]  10/8 16/21 22/7 55/22
  57/19
understanding [2]  7/9 21/19
undisputed [1]  50/14
unequivocally [1]  25/9
unique [1]  26/4
UNITED [4]  1/1 44/12 66/6 66/10
unless [1]  48/6
unlimited [2]  53/21 53/22
until [7]  7/25 8/5 8/6 8/11 15/19 22/3
  33/10
up [19]
update [1]  40/8
us [23]
use [3]  31/17 34/23 62/17
used [1]  39/6

**V**

valid [1]  18/17
verdict [5]  49/11 50/14 50/18 51/7 55/17
very [18]
violate [1]  58/16

violating [2]  20/7 60/14
violation [1]  34/13
virtually [2]  13/12 54/1
Vuitton [1]  35/17

**W**

want [17]
wanted [5]  14/13 44/14 44/16 44/21 60/2
warning [3]  26/24 27/4 55/8
warnings [1]  39/16
was [85]
wasn't [4]  7/22 21/19 26/5 30/18
way [11]  5/12 7/25 8/6 8/8 8/11 11/17
  14/4 15/21 18/11 38/7 39/18
we [189]
we'd [2]  26/22 37/2
we've [8]  29/18 30/17 32/24 35/2 56/22
  57/6 57/14 64/13
web [1]  37/3
website [2]  36/14 36/17
Wednesday [1]  49/15
week [7]  10/11 32/4 49/24 49/24 57/16
  60/17 62/16
welcome [1]  58/14
well [32]
went [2]  38/22 43/22
were [69]
weren't [1]  25/8
WESTERN [2]  1/3 47/10
what [56]
what's [10]  3/24 5/22 6/5 12/25 19/21
  32/8 33/19 47/14 53/5 63/19
whatever [4]  7/14 9/9 58/3 62/16
whatsoever [4]  8/1 8/7 15/5 55/8
when [44]
When's [1]  11/13
whenever [2]  58/9 58/9
where [16]
whether [23]
which [14]
who [27]
Whoa [3]  28/3 28/3 28/3
whoever [2]  7/2 59/13
whole [2]  41/19 41/20
whom [1]  44/25
why [23]
Wil [2]  1/20 66/16
Wilcox [2]  1/20 66/15
wilfulness [2]  24/13 24/14
will [36]
willful [4]  30/10 33/21 34/4 40/10
willfully [1]  47/24
willfulness [13]  24/17 25/2 25/7 25/21
  30/9 33/8 33/10 33/14 33/25 34/7 34/8
  34/14 52/2
wish [1]  50/24
withdrawn [2]  42/3 42/6
within [4]  5/21 10/18 60/15 60/21
without [2]  14/10 47/23
witness [12]  10/11 13/12 19/23 22/25
  32/23 42/11 42/13 50/19 53/1 57/15 62/3
  62/13
witnesses [13]  7/8 9/25 10/2 10/5 13/8
  19/2 26/8 26/8 26/17 61/13 61/18 61/25
  62/22
witnesses' [1]  15/15
won't [2]  10/12 57/13
word [1]  27/8
words [3]  9/25 14/21 42/12
work [15]
worked [3]  49/17 57/20 58/2
workers [1]  44/12
working [1]  52/6
works [1]  25/1

worth [1]  33/24
would [16]
written [1]  9/24
wrong [1]  26/11

**Y**

yeah [7]  4/21 23/4 42/2 45/3 47/5 47/19
  59/20
year [11]  8/5 8/6 14/9 16/17 17/7 22/23
  27/7 63/21 63/23 64/4 64/5
years [6]  9/13 18/2 18/4 18/20 23/5 53/22
yes [59]
yesterday [3]  19/24 22/25 53/1
yet [4]  16/23 23/11 52/5 59/16
YORK [3]  2/5 2/17 20/18
you [223]
you'd [3]  40/14 49/24 60/18
you've [9]  5/7 24/12 25/15 30/10 42/8
  42/23 43/10 58/21 64/11
your [148]
yourself [1]  60/18
yu [4]  2/9 2/10 2/12 3/7